**DURA–WOOD TREATING COMPANY, Division of Roy O. Martin Lumber Company, Inc., Plaintiff-Appellee Cross-Appellant,**

v.

**CENTURY FOREST INDUSTRIES, INC., Defendant-Appellant Cross-Appellee.**

No. 81–2041.

United States Court of Appeals,
Fifth Circuit.

May 14, 1982.

Zelesdey, Cornelius, Rogers, Hallmark & Hicks, James R. Cornelius, Jr., Robert L. Flournoy, Lufkin, Tex., for defendant-appellant, cross-appellee.

George T. Allison, III, Longview, Tex., for plaintiff-appellee, cross-appellant.

Before WISDOM, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

Plaintiff—Dura-Wood Treating Company, a division of Roy O. Martin Lumber Co., Inc. (Dura-Wood)—brought suit against defendant, Century Forest Industries, Inc. (Century Forest), alleging a breach of contract. The court had jurisdiction by virtue of diversity of citizenship. The district court, holding the parties had entered into a legally binding contract, determined that Century Forest breached the contract and

rendered judgment in favor of Dura-Wood for the amount of $100,000. Although the district court held Century Forest acted unconscionably in breaching the contract it had with Dura-Wood, it did not apply the treble damage provisions of the Texas Deceptive Trade Practices—Consumer Protection Act in determining the ultimate amount of damages.

This Court affirms the district court's judgment as it relates to the determination that Century Forest breached a legally enforceable contract. However, the Court reverses in part the damage award.

## I. Facts

Dura-Wood and Century Forest are both in the business of treating cross-ties for industrial and commercial use, and are both "merchants" within the meaning of the Texas Business & Commerce Code § 2.104(a).[1] On October 19, 1977, Dura-Wood contracted to supply a third party—the William A. Smith Company (Smith Company)—with cross-ties. In early April of 1978, an agent of Dura-Wood, Clyde M. Norton, contacted Melvin H. Durham, an agent of Century Forest, by telephone. The substance of the conversation is disputed. It is clear, however, the conversation did include a discussion of Dura-Wood's need for additional cross-ties in order to meet its contractual obligations with the Smith Company. Additionally, the two agents[2] discussed Century Forest's capability to provide Dura-Wood with approximately 20,000 cross-ties. The cross-ties discussed were six by eight by eight feet, six inches, and the price discussed was $8.60 per tie.

Following the conversation, Dura-Wood, by its agent Norton, sent a letter dated April 5, 1978 to Century Forest. The content of the letter, in its entirety, stated:

Confirming our conversation, please enter our order of 20,000 6 × 8—8'6" No. 3 hardwood ties at $8.60 each. These are to be treated with creosote coal-tar solution. We will advise instructions just as soon as we get some releases on the job.

Century Forest did not respond to this letter in writing. However, communications between the parties' two agents continued. In fact, since Dura-Wood's need to fulfill its contractual obligation to the Smith Company was delayed, Century Forest's agent Durham indicated that Norton should "just let him know when the ties were going to be needed."

Smith Company, by letter dated June 30, 1978, informed Dura-Wood that the cross-ties would be needed in the last quarter of 1978 or the first quarter of 1979. Accordingly, Dura-Wood, by its agent Norton, telephoned Century Forest to relate the date the ties would be needed. At this time, Norton was made aware that Melvin Durham was no longer employed by Century Forest. As a result, Norton talked to S. Harry Kerr, who was in charge of sales for Century Forest. Kerr also testified he was president and chairman of the board of the corporation.

---

1. Section 2.104(a) of the Tex.Bus. & Com.Code Ann. (Vernon 1968) states,

   "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

   Unless otherwise noted, all references to the Tex.Bus. & Com.Code Ann. or the Tex.Bus. & Com.Code are references to the Uniform Commercial Code as adopted by the State of Texas. Tex.Bus. & Com.Code Ann. (Vernon 1968 and Supp.1982).

2. Clyde M. Norton, the agent for Dura-Wood, testified he was in charge of the overall management of the Dura-Wood Division of Roy O. Martin Lumber Company. Melvin H. Durham, who was the vice president and plant manager of Century Forest, was the person involved in the telephone conversation held in early April 1978 on behalf of Century Forest. The record indicates Durham was in charge of the day-to-day operation of the plant. He negotiated sales and sold products for Century Forest.

   The record also reveals that Norton and Durham had engaged in a more general exploratory discussion regarding a sale of cross-ties that Dura-Wood would use to satisfy its obligations under the Dura-Wood/Smith Company contract as early as October or November of 1977.

Norton testified he was told by Kerr "that due to an increase in cost of ties . . . he would not be able to ship that order and would have to cancel it." Subsequent to this phone conversation, Dura-Wood received a letter from Harry Kerr dated August 29, 1978. The letter stated, "Due to the change in personnel and operations of Century Forest, we regret to inform our customers that all quotations and orders prior to July 31, 1978, cannot be accepted or shipped." Kerr testified this letter was sent to its customers as a result of determinations regarding the price Century Forest would need to charge for its products in order to make a profit. He testified that Century Forest did not cancel every order that had been placed prior to July 31, 1978. He stated the decisions regarding which to cancel were influenced by what price Century Forest was to receive for the sale, and that he believed Dura-Wood had waited too long to request delivery of the cross-ties. Kerr also testified, however, that he did not know what Durham might have said on behalf of Century Forest during negotiations throughout the previous summer.

Dura-Wood continued to urge Century Forest to supply the needed cross-ties. Indeed, Dura-Wood received a letter from Robert L. Flournoy—who owned stock in Century Forest and served as an attorney for the corporation—dated December 19, 1978. In this letter, Flournoy, although denying the existence of a contract, stated Century Forest was "agreeable to further discussion in an effort to resolve this matter." However, faced with the prospect that resolution by Century Forest of the matter was not forthcoming, Dura-Wood obtained price quotations for substitute ties from other manufacturers. Upon review of the price quotations, Dura-Wood determined that it could produce the ties internally at a lower price than it could purchase substitute ties from other manufacturers.

Further discussion between Dura-Wood and Century Forest appeared fruitless at the time Dura-Wood was obligated to begin shipping cross-ties to Smith Company. Shipping began in February of 1979 and was concluded in June of 1979. As a result, Dura-Wood manufactured ties in April, May, and June of 1979 specifically to replace the ties it had undertaken to purchase from Century Forest and sell to Smith Company.

## II. The Dura-Wood/Century Forest Contract

The district court found that Dura-Wood and Century Forest entered into an oral contract for the sale and purchase of cross-ties. It also held that enforceability of this oral contract was not barred by the statute of frauds, since Dura-Wood's letter of April 5, 1978 confirmed the contract as required by section 2.201 of the Tex.Bus. & Com. Code. This Court affirms these findings of the district court.

### A. The Statute of Frauds Issue

Section 2.201(a) of the Tex.Bus. & Com. Code, the statute of frauds, states that a contract for the sale for goods for a price of $500 or more is unenforceable unless it is evidenced by a writing signed by the party against whom enforcement is sought. In the instant case, section 2.201(a), in its purest sense, would render the Dura-Wood/Century Forest contract legally unenforceable unless it was evidenced by a writing signed by Century Forest. Of course, no such writing existed in the case *sub judice.*

However, section 2.201(b) of the Tex.Bus. & Com.Code modifies the rule of section 2.201(a). Section 2.201(b) provides that a writing signed by the party against whom enforcement is sought is unnecessary if certain other circumstances exist. Initially, the oral contract must be between "merchants," as that term is defined by the Tex.Bus. & Com.Code. In addition, within a reasonable time after the oral contract is made, a writing in confirmation of the contract must be received by the party to be charged. The writing must be sufficient against the sender, and the party receiving it must have reason to know of its contents. Such a writing satisfies the requirements of section 2.201(a) and makes the oral contract

legally enforceable against the receiver unless written notice of objection to its contents is given within ten days after it is received.

As noted, it is undisputed that both parties are merchants as that term is defined by the Tex.Bus. & Com.Code. The district court found, therefore, that the letter of April 5, 1978 was a writing sufficient to satisfy the dictates of section 2.201(b).

Century Forest, however, argues the letter was not a confirmation of a contract. Century Forest claims the letter was nothing more than an offer to enter into a contract. In support of its position, Century Forest points out the letter begins, "Confirming our conversation, please enter our order . . . ." Century Forest argues an "order" is the legal equivalent of an "offer," which section 2.206 of the Tex.Bus. & Com. Code dictates must be accepted before a contract exists. Additionally, Century Forest argues that a confirmatory writing must evidence a "contract for the sale of goods." All this letter did, Century Forest argues, was confirm a "conversation."

■ At the outset, this Court recognizes the basic rule of contracts dictating that an offer—standing alone—is not an enforceable contract. An offer must be accepted in order to have a contract. The Court also recognizes that, in many instances, an order of goods—standing alone—constitutes a simple offer.

■ In the case *sub judice*, however, the letter of April 5, 1978 was more than a simple offer to enter into a contract.[3] Initially, it is imperative to note that Comment One to section 2.201 states that, in order to satisfy the statute of frauds' strictures, "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." This comment is consistent with the Tex.Bus. & Com.Code's underlying purposes and policies—to simplify, clarify, and modernize business practices. Tex.Bus. & Com.Code Ann. § 1.102(b)(1). In line with these goals, section 2.201 does not require specific words in order to confirm the oral contract.

■ Applying the policy of the Tex.Bus. & Com.Code, together with a precise reading of section 2.201, the letter of April 5, 1978 was sufficient to confirm an oral contract, and the district court did not err in so finding. The letter indicates it was sent as confirmation of a previous conversation. It implicitly sets out that, as a result of the previous conversation, Dura-Wood has followed through on its obligation and was confirming the oral contract by placing a written order for the goods discussed in the earlier conversation. It is sufficient against the sender. While placing an order—standing alone—may be only an offer and, therefore, no contract, Dura-Wood's following through on an alleged oral contract by placing a written order could *confirm* the oral contract. The letter in question certainly provides a reasonable basis for believing that the offered oral evidence rests on a real transaction.

## B. *The Underlying Oral Contract*

Removal of the statute of frauds as a defense only resolves part of the contractual dispute. An underlying oral contract must be proved. The district court held the parties entered into a valid oral contract. Century Forest argues that such a determination is clearly erroneous. *See* Fed.R. Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *See also Marcum v. United States*, 621 F.2d 142 (5th Cir. 1980); *Ferrero v. United States*, 603 F.2d 510 (5th Cir. 1979).

---

**3.** The Court has reviewed those cases cited by Century Forest as authority for the proposition that an "order" is automatically an "offer" and, ipso facto, no contract could exist in the case *sub judice*. These cases do not support Century Forest's position. The most striking distinction between the cases cited by Century Forest and the case *sub judice* is that, in the cases cited by Century Forest, the alleged "confirmatory writings" expressly declared the writing to be a simple "offer" and, in one case, declared the offer to be open to consideration by the person receiving the letter.

Century Forest argues the district court's finding was clearly erroneous because there was not ample evidence to sustain such a finding. Dura-Wood's entire case, Century Forest argues, rests upon vague and indefinite recollections of its vice-president. Century Forest argues that certain essential terms of a valid contract were left out of the alleged contract, and places particular emphasis on its claim that there was never an agreement regarding what specifications the cross-ties were to meet.

At the outset, a contract does not fail for indefiniteness—although one or more terms are left open—if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. Tex.Bus. & Com.Code Ann. § 2.204(c). The comment to section 2.204(c) explains, "If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy." [4]

■ Accordingly, the first step in the Court's analysis is to determine whether the district court's fact decision regarding the parties' intentions was clearly erroneous. Examination of the trial record reveals sufficient evidence to support the district court's conclusion that there was a meeting of the minds and that there was the requisite intent to enter a contract.

Both Clyde Norton and Melvin Durham testified they spoke to each other by telephone on April 5, 1978. As noted previously, the conversation included a discussion of Dura-Wood's needs for cross-ties and Century Forest's willingness to supply them. When asked by the court to describe the conversation, Norton testified:

> I told him I wanted to buy the 20,000 cross-ties at the price of $8.60 that he was selling cross-ties for, and that we would go ahead and take the 20,000 cross-ties. And he said okay, we will supply. In fact, I asked him initially if they would

take half the order [the order of Smith Company for 50,000 cross-ties], and he said no, I won't take half of it. I said well, will you take 20,000. He said yes, we'll take 20,000. At that point, I confirmed that we were going to purchase 20,000 cross-ties from him to be shipped sometime between January of 1978 and September of 1978.

Durham's rendition of the conversation's substance is strikingly similar. He testified the two men discussed the fact that Century Forest would be unable to supply 25,000 ties, or half of the Smith Company order, but could supply 20,000. According to Durham's testimony, the agents discussed the size of these cross-ties, concluding they were to be eight by six by eight feet, six inches. In Durham's words,

> So, we had a specific number of ties, a specific quality of ties. These ties were stacked on trips of 30 ties to the bundle, and if we could treat these ties dry, we had a definite price and a definite quality that we could have sold the ties for. This is the lot we were talking about.

It was during this testimony, that Durham—the agent for Century Forest—was asked, "Are you saying that Mr. Norton told you that you could expect to deliver and be paid for these ties in April, May, and June?" Durham responded, "Yes, sir."

There was further testimony that demonstrated Norton telephoned Durham after April 5, 1978 on more than one occasion and, at least once, inquired as to whether Dura-Wood should pay for the cross-ties at that time, allow Century Forest to treat them, and wait on shipment from Century Forest until Smith Company wanted them. Indeed, Dura-Wood offered to pay for the cross-ties prior to actually needing them. However, Norton was advised by Durham that such action was unnecessary.

The district court's determination that the parties intended a contract is substantiated in at least three other respects. First,

---

**4.** The comment continues: "The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement." Comment, Tex.Bus. & Com.Code Ann. § 2.204(c).

the April 5, 1978 letter was dated the same day both Norton and Durham testified they discussed the sale of the cross-ties. Additionally, Durham testified the letter expressed, in general terms, the substance of the discussion between the two agents. Finally, although it is unclear precisely what the effect of such a form is, Century Forest filled out a "phone order form" that stated 20,000 six by eight, eight and one-half # 3 MHW ties were "sold to" Dura-Wood and "promised upon release." This is apparently the form referred to by Harry Kerr in his letter to Dura-Wood dated September 26, 1978, which stated, "All we have pertaining to this [the order of 20,000 cross-ties] was an *in-plant working schedule* of orders to be prepared for treating." (emphasis added). Kerr also testified that he had seen an in-house instrument that reflected Century Forest planned to produce the requested cross-ties by September of 1978.

It is clear the parties had a meeting of minds regarding what was to be bought and sold. The district court's fact decision was not clearly erroneous regarding the parties' entry into a contractual obligation.

As a result, the Court turns to the second step in the section 2.204 equation to determine whether there is a reasonably certain basis for an appropriate remedy, since certain contractual terms were indefinite or omitted. The most obvious basis for a remedy is the April 5, 1978 letter written by Norton to Durham. The letter stated:

> Confirming our conversation, please enter our order of 20,000 6 × 8—8′6″ No. 3 hardwood ties at $8.60 each. These are to be treated with creosote coal-tar solution. We will advise instructions just as soon as we get some releases on the job.

This letter, which was written the same day Norton and Durham discussed the sale of the ties, set out many of the essential terms of the contract. The letter expressly mentioned the quantity, size, style, and price of the goods.[5] It also set out the terms of treatment, which involves injecting the cross-ties with certain substances that serve as preservatives—such as creosote coal-tar solution.

Century Forest argues, however, that simply stating, "These are to be treated with creosote coal tar solution," is too indefinite to form a contract. Century Forest's argument is that "[i]n the case at bar, there is no evidence from Dura-Wood as to what mixture of oil was to be used [or] what amount of oil the ties were to be treated with."

However, Century Forest's agent—Durham—testified the parties discussed treatment of the cross-ties. He stated, "I'm sure that when I discussed it with him, I told him—if I give him a price of $8.60, which is what we did, I told him that would be for seven pounds 60–40." Durham continued his testimony and explained his reference to seven pounds was a description of how many pounds of oil per cubic foot of pressure would be applied. He explained that "60–40" means sixty percent creosote and forty percent coal-tar.

This, of course, addresses Century Forest's argument that the last sentence of the letter, which states, "We will advise instructions just as soon as we get some releases on the job," renders the letter too indefinite to confirm an oral contract. The record indicates this statement was understood to refer to the date for shipping.

The letter also failed to specify a place for delivery. Tex.Bus. & Com.Code § 2.308, however, provides for such a place. Section 2.308 states that "[u]nless otherwise agreed ... the place for delivery of goods is the seller's place of business." In addition, the record reflects that it is common in the "cross-tie industry" for the seller to deliver the cross-ties to the buyer's place of business.

---

5. The letter did not set out the date of delivery. There were, however, other reasonably certain methods for determining the date. Section 2.309 of the Tex.Bus. & Com.Code, which is commonly considered to be a "gap filler," states, "The time for shipment or delivery ... under a contract if not ... agreed upon shall be a reasonable time." § 2.309(a). There was testimony that, in the cross-tie industry, it is customary not to know when the need for the ties will actually arise. Accordingly, after Durham was advised there would be a delay in the need, he told Norton, "Well, just let [me] know when the ties [are] going to be needed." He subsequently was informed of the date, which apparently led to his understanding that he could expect to perform and receive payment for the ties in April, May, and June.

Century Forest also argues there was no agreement regarding what standards of size were to be followed. Specifically, the argument is that cross-ties are governed by two sets of standards. One set of standards—AREA (American Railroad Engineer Association)—is more stringent than the other set of standards—RTA (Railroad Tie Association). Durham testified, however, that the ties Century Forest could sell would have met RTA specifications. In fact, Durham stated Century Forest never marketed ties that satisfied the more stringent AREA specifications. Inasmuch as Dura-Wood and Century Forest dealt with each other on several occasions, it would not be clearly erroneous to determine that Dura-Wood was aware and would expect that any ties Century Forest supplied would meet only RTA standards.

It should be noted Century Forest attempts to utilize the Dura-Wood/Smith Company contract to avoid liability. Century Forest argues the Dura-Wood/Smith Company contract contemplated the sale of cross-ties that would meet more stringent specifications than Century Forest allegedly was to supply Dura-Wood. Since Dura-Wood was contracting with Century Forest in order to satisfy its contract with Smith Company, Century Forest argues there could have been no meeting of minds between Dura-Wood and Century Forest.

This argument is not well founded. At the outset, the Dura-Wood/Smith Company contract was independent of, and in no way controlled, any potential contract between Dura-Wood and Century Forest. If Dura-Wood attempted to use the cross-ties purchased from Century Forest to satisfy its obligations with Smith Company, and failed to do so because the ties were not according to specifications, Smith Company may have had a breach of contract action against Dura-Wood. However, such a possibility in no way diminishes the meeting of minds between Dura-Wood and Century Forest regarding 20,000 eight by six by eight feet,

six inch cross-ties treated with seven pound 60–40 creosote coal-tar.[6]

Finally, Century Forest argues the prior course of dealing between it and Dura-Wood demonstrates there was no contract between the parties in the instant case. The basis of Century Forest's argument is that on a previous occasion—in a significantly smaller order—Dura-Wood sent Century Forest a detailed written purchase order that specifically set out what product of Century Forest was being purchased. In this previous instance, there was a written offer and a written acceptance. Century Forest argues such a practice is Dura-Wood's customary method of doing business, and the fact such a practice was not followed in the instant case demonstrates no contract was intended.

Dura-Wood, on the other hand, directly contradicts the foundation of Century Forest's argument. Dura-Wood points out that because a more formal contract was made between the parties on a previous occasion does not create a course of dealing involving formal written contracts. Indeed, the record indicates the solitary formal contract isolated by Century Forest was an aberration, and formalities were utilized only because Dura-Wood was obtaining ties from Century Forest in order to fulfill a government contract in which strict performance was a condition.

In summary, the district court's factual determination that Dura-Wood and Century Forest entered into an oral contract to buy and sell cross-ties was not clearly erroneous.

## III. *Damages*

The district court's damage award will be addressed in three parts. First, there is a question regarding actual damages as they relate to Dura-Wood's "cover." The second part addresses the so-called "potential profits" allegedly lost as a result of Dura-Wood's method of covering. Finally, there

6. Dura-Wood may very well have intended to modify the contract it had with Smith Company depending on what it could obtain from Century Forest. Indeed, such action was attempted.

is a question regarding profits that Dura-Wood would have received as a result of its contract with Smith Company, but lost because of Century Forest's breach of contract.

### A. Cover

When a seller breaches a contract, the buyer "may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Tex.Bus. & Com.Code Ann. § 2.712(a). "Covering" is an optional remedy for the buyer faced with securing a damage award. See Tex.Bus. & Com.Code § 2.711; Tex.Bus. & Com.Code § 2.712; Comment 3, Tex.Bus. & Com.Code § 2.712. If he chooses to cover, "The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages." Tex.Bus. & Com.Code § 2.712(b).

In the case sub judice, Dura-Wood claims—and the district court found—it engaged in a valid method of cover by manufacturing the necessary ties itself. Century Forest argues this is an invalid mechanism for cover. The basis of Century Forest's argument is that the Tex.Bus. & Com.Code does not contemplate a buyer's covering by purchasing from itself. Century Forest argues the purchase of or contract to purchase goods in substitution of those due from the seller must be made "on the market."

This Court recognizes the language of section 2.712, read literally, appears to contemplate the purchase of cover goods should be from an outside source. However, the Code is to be "liberally construed and applied to promote its underlying purposes and policies." Tex.Bus. & Com.Code § 1.102(a). The Code "is drawn to provide flexibility." Comment 1, Tex.Bus. & Com. Code § 1.102. Consequently, a buyer should be able to cover by manufacturing goods in substitution of those due from the seller, if such a cover otherwise satisfies and promotes the purposes and policies of the Tex.Bus. & Com.Code.

Comment one to section 2.712 states the "section provides the buyer with a remedy aimed at enabling him to obtain the goods he needs thus meeting his essential need." This statement essentially describes two purposes that may be fulfilled by an appropriate cover. First, it puts an aggrieved buyer in the same economic position in which it would have been had the seller actually performed. Second, it allows the buyer to achieve its prime objective, which is acquiring the needed goods. See, White, J. & Summers, R., Handbook of the Law Under the Uniform Commercial Code 222 (West 1980).

This Court acknowledges there is some language indicating the purchase of substitute goods should be "on the market." See Kiser v. Lemco, 536 S.W.2d 585 (Tex.Civ. App.—Amarillo 1976, no writ). However, this language is explained by the Texas courts' interpretations of section 2.712. As Century Forest itself points out, the Texas courts have noted that one policy behind section 2.712 is a presumption "that the cost of cover will approximate the market price of the undelivered goods." Jon-T Farms, Inc. v. Good Pasture, Inc., 554 S.W.2d 743, 749 (Tex.Civ.App.—Amarillo 1977, writ ref'd n. r. e.). Indeed, an appropriate cover has the effect of setting the market price so that an aggrieved buyer does not have to prove damages through more onerous means.[7] However, actually purchasing the cover goods from another source is not the exclusive means of satisfying the presumption of section 2.712. In an appropriate situation, internally producing the substitute or cover goods can satisfy the recognized underlying presumptions of section 2.712.

Regarding the case sub judice, this Court finds no error in the district court's actual damage award based upon Dura-Wood's cover. This Court determines that a buyer,

---

7. As will be noted in greater detail, covering by internally manufacturing the product may, as in the instant case, reduce the losses that have to be borne.

at least in the case *sub judice*, may cover by manufacturing goods internally. The purposes and presumptions of the Tex.Bus. & Com.Code can be, and are, fulfilled in those instances—such as in the instant case—when the buyer is already in the marketplace and can produce the goods at a price approximating or lower than the market price. It would defy reason and the Tex. Bus. & Com.Code's purposes of flexibility and adaptation to reasonable commercial practice to require a buyer to increase losses by covering through the purchase of goods from another seller, if it could produce the goods itself at a lower price. This is particularly true when it is recognized that such a determination would remove the other advantages that section 2.712 contemplates from cover.

As a factual matter, cover by internal manufacturing must be in "good faith." The Tex.Bus. & Com.Code provides workable definitions of good faith in at least two pertinent places.[8] Section 1.201(19) defines good faith as "honesty in fact in the conduct or transaction concerned." Section 2.103(a)(2) expands this basic definition in order to make it specifically applicable to merchants. " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Tex. Bus. & Com.Code § 2.103(a)(2).

Another factual matter concerns the necessity for the aggrieved buyer to cover without "unreasonable delay" and to make a "reasonable purchase." The Tex.Bus. & Com.Code provides only limited aid for the court attempting to determine whether a cover purchase is reasonable in the appropriate respects. However, there is some aid. Initially, section 1.204(b) provides guidelines for what a reasonable time within which to cover may be. The section states, "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

Additionally, Comment two to section 2.712 dictates, "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." At a minimum this "test" suggests a buyer has some time in which to evaluate the situation and attempt to determine what may be the best or most appropriate means to cover. *See* Comment 2, Tex.Bus. & Com.Code § 2.712.

Finally,[9] there is the factual requirement that the goods be "in substitution for those due from the seller." Comment two to section 2.712 points out that "[t]he definition of 'cover' ... envisages ... goods not identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case."

The record demonstrates good faith on the part of Dura-Wood in choosing to cover by manufacturing the cross-ties internally. Dura-Wood took price quotations and ultimately determined it could produce the ties at a lower price. The district court's finding that Dura-Wood acted in good faith—which is implicit in its determination regarding actual damages—is not clearly erroneous.

Additionally, the district court's finding that Dura-Wood covered within a reasonable time and provided a reasonable substitute was not clearly erroneous. The record reveals Dura-Wood waited to cover in order to evaluate the market for cross-ties. There is evidence demonstrating the cross-tie market is volatile and subject to fluctuations. The price of cross-ties was high during the time Dura-Wood was evaluating the market. Consequently, Dura-Wood's waiting to determine whether a decrease in market price might occur was not unreasonable. In addition, Dura-Wood continued to urge performance, as contemplated by section 2.610 of the Tex.Bus. & Com.Code.

8. Section 1.203 of the Tex.Bus. & Com.Code expressly establishes that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement."

9. Of course, this Court in no way means to imply this is a definitive list of "cover" requirements. These are, however, the requirements perceived to be relevant to this particular case.

The record also demonstrates the internally produced cover goods were commercially usable as reasonable substitutes for those due from Century Forest.

### B. Potential Profits

The district court awarded Dura-Wood $42,000 as "potential profits" that it lost "by using its own facilities to produce cross-ties to replace those which the defendant refused to provide." In other words, the district court found that, when Dura-Wood covered by internally manufacturing the cross-ties, it could have been producing cross-ties and selling them to new or different customers instead of producing them in substitution for goods due from Century Forest.

As a general proposition, lost profits are consequential damages as contemplated by Tex.Bus. & Com.Code § 2.715(b). *See General Supply & Equipment Co., Inc. v. Phillips*, 490 S.W.2d 913 (Tex.Civ.App.— Tyler 1973, writ ref'd n. r. e.). Section 2.715 establishes that consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Of course, section 2.712 allows a plaintiff to obtain consequential damages. Tex.Bus. & Com.Code § 2.712.

However, the district court's damage award for "potential profits" does not fall within the contemplation of section 2.715. It is true Dura-Wood, by manufacturing its own cross-ties, covered for less money than if it had purchased ties from some other source. It is also true that, while Dura-Wood was producing its cross-ties, its facilities were tied up and Dura-Wood was unable to manufacture goods for new or different contracts. However, Dura-Wood could have minimized its *overall* losses. The cost of producing the ties plus the cost of lost profits resulting from Dura-Wood's inability to enter into new or different contracts was greater than the cost of simply purchasing the cover goods from another source. If Dura-Wood had purchased ties from someone else, its facilities would not have been tied up and Dura-Wood would have been able to enter new or different contracts. As a result, Dura-Wood would have had lower overall costs. Century Forest should not be obligated to pay for Dura-Wood's poor choice.

The so-called loss of potential profits could have reasonably been prevented by a different form of cover or otherwise. In the absence of such preventative measures, the district court's award of consequential damages, as it relates to the loss of potential profits, is not authorized by section 2.715.

### C. Lost Profits on the Dura-Wood/Smith Contract

The district court also awarded Dura-Wood $13,000 for "lost profits on its contract with the third party [Smith Company]." This amount was computed by determining the amount of profit per tie Dura-Wood would have received from Smith Company had Century Forest performed, and was awarded as consequential damages. However, the award was erroneous since it allows Dura-Wood a double recovery as to the $13,000.

Dura-Wood received an actual damage award that considered the difference between the cost of cover and the contract price. Since Dura-Wood was able to provide Smith Company with cross-ties and received payment, there is no room for the $13,000 award. Stated another way, Dura-Wood already had been compensated for the fact that producing its own cross-ties was more expensive than buying them from Century Forest.

### IV. The Texas Deceptive Trade Practices Act

The district court concluded that Century Forest acted unconscionably in breaching the contract it had with Dura-Wood. The court, however, concluded the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA), Tex.Bus. & Com. Code Ann. § 17.41 *et seq.* (Supp.1981), was

not applicable to the case. Dura-Wood desired application of the treble damages provision of the DTPA.

The DTPA is not applicable to the case *sub judice*, regardless of the district court's conclusion concerning unconscionability. Section 17.46 of the DTPA declares "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Dura-Wood's argument is "that it was a deceptive trade practice to allow Plaintiff to rely on the oral contract confirmed by the letter, then to refuse to carry out the agreement after the price of the ties increased."

This argument is ill-conceived. It argues that the breach of contract—standing alone—was a false, misleading, or deceptive act or practice in the conduct of a trade or commerce. In other words, Dura-Wood argues it is deceptive to enter into a contract and later breach that contract, since Dura-Wood entered the contract believing Century Forest actually would perform. However, an allegation of breach of contract—without more—does not constitute a false, misleading, or deceptive action such as would violate section 17.46 of the DTPA. *Coleman v. Hughes Blanton, Inc.*, 599 S.W.2d 643, 646 (Tex.Civ.App.—Texarkana 1980, no writ); *Holloway v. Dannenmaier*, 581 S.W.2d 765 (Tex.Civ.App.—Fort Worth 1979, writ dism'd). *See Smith v. Baldwin*, 611 S.W.2d 611, 614 (Tex.1981); *Patton*, 33 Baylor Law Review 533, 556–59 (1981); *Chrysler Corp. v. Schuenemann*, 618 S.W.2d 799, 807 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ).

Since a simple breach of contract is not contemplated as a deceptive trade practice under the Texas DTPA, this Court finds no error in the district court's conclusion that the DTPA is inapplicable in the case *sub judice.*

V. *Conclusion*

This Court affirms the district court's determination that Dura-Wood and Century Forest entered a legally enforceable contract. In addition, it affirms the district court's award of actual damages as ex-

pressed in the court's Finding of Fact No. 10. This Court, however, reverses the district court's award of lost profits as expressed in the court's Findings of Fact Nos. 11 and 12.

This case is remanded to the district court for entry of a judgment consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.