CIVES CORPORATION

v.

CALLIER STEEL PIPE & TUBE, INC.

Supreme Judicial Court of Maine.

Argued March 16, 1984.

Decided Oct. 15, 1984.

Fitzgerald, Donovan & Conley, Constance P. O'Neil (orally), Bath, for plaintiff.

John A. Klobasa (orally), Alan C. Kohn, St. Louis, Mo., Doyle & Nelson, Michael J. LaTorre, Augusta, for defendants.

Before NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ., and DUFRESNE, A.R.J.

**854**

DUFRESNE, Active Retired Justice.

A jury-waived trial in Superior Court (Kennebec County) resulted in the entry of judgment in the amount of $15,679.91 in favor of the plaintiff, Cives Corporation ("Cives") in its breach of contract suit against Callier Steel Pipe & Tube, Inc. ("Callier"), and of judgment in the amount of $1,163.23 in favor of the defendant, Callier, on its counterclaim. Cives appeals the court's denial of damages for certain overhead expenses and Callier cross-appeals the breach of contract award. We affirm the Superior Court on all issues under appeal.

In late 1977 Georgia-Pacific Corporation was seeking bids for the construction of a tissue products plant in Plattsburg, New York. As a result of its low bid, Cives was given the contract to provide the structural steel for part of the roof of this plant. This contract called for payment of slightly less than $400,000 out of a total cost of $35 million for the entire project. Cives was to deliver the steel by January 23, 1978 at the site, and the contract expressly provided that time was of the essence. Because Cives is not usually a manufacturer of steel tubes (it usually deals with steel plates), Cives' production manager, Stephen Astoria, Jr., discussed the purchase of the needed tubes with one Joseph Shaeffer, a salesman at Callier's. Following their verbal agreement of purchase and sale over the phone, Astoria, according to trade practices, sent a written purchase order to Callier Steel Pipe & Tube, Inc., of St. Louis, Missouri, purportedly incorporating the oral contract. This purchase order, dated December 7, 1977, called for the delivery at the Cives plant in Augusta, Maine, of steel tubing of specific shape, length and weight

with unit prices, "All materials to conform to A501–Hot Formed or A500 Grade B-Cold Formed" and "All welds are to be 100% penetration." At the top right corner of the purchase order appeared the legend "REQD BY (meaning *required by*) [followed by the time] 1/3/78." In bold print on the face of the order, it was provided

THIS ORDER IS SUBJECT TO ALL TERMS AND CONDITIONS SHOWN ON THE FACE AND REVERSE SIDE HEREOF

Among the conditions articulated in smaller print on the reverse side of the order, there were provisions calling for time being of the essence of the contract and limiting assignments thereof.[1] Again, on the face of the order form in the left bottom corner, space was provided for acceptance by the supplier with the word "ACCEPTED" in bold print positioned to the left of *where* the intended signature or authentication was contemplated. Although this purchase order stated at the very bottom on its face to

execute and return duplicate copy to Cives Steel Company New England Division[,]

no such execution by signing or authenticating, nor any return thereof was ever made. Callier, however, never objected to any of the terms of the purchase order, except after litigation when it claimed that all delivery dates under industry custom are approximate only. The total price of this subcontract as modified by two change orders respectively dated December 9 and 12, 1977, was $28,546.00.

It was on the 12th of December that Astoria of Cives, in conversation with

---

1. 9. *Time of Essence.* The delivery schedule contained herein is of the essence of this agreement. If the Seller shall fail or neglect to timely perform any provision of this Purchase Order, or if insufficient performance or materials referred to in Paragraph 1, above, cannot be remedied by Seller within the terms of the delivery schedule, Buyer, after three (3) days notice to the Supplier, may at *its* option, without prejudice to any other remedy, secure the same and deduct the cost thereof from the payment(s)

then or thereafter due to the Supplier. If the expense thereof shall exceed such unpaid balance, the Seller shall be liable for such excess.

11. *Assignment.* Neither Seller's obligations hereunder nor its right to payment under this Purchase Order may be assigned without prior written consent of Buyer, nor may Seller use lower tier suppliers to perform part or all of this Purchase Order, without prior written consent of Buyer.

Shaeffer of Callier, discovered that the company did not have the tubes in its inventory and could not obtain them from the mill. This, Astoria was informed, would necessitate the fabrication of the tubes. This in turn would require a change in the process of manufacture and bring about an increase in the price. The stated second change order confirmed Cives' agreement to these particular adjustments. In that same conversation, it was learned that the fabrication of the steel tubes had been subcontracted to another company, the identity of which the Callier personnel was reluctant to disclose. It was late December when Cives' project manager, Kurt Huber, after persistent prodding, finally learned that Lanan Products of Chicago ("Lanan") would be fabricating the tubes for Callier. Donald Hardy, Cives' president and general manager of its New England Division, Augusta, at that point became apprehensive concerning Callier's ability to meet the January 3rd delivery deadline under the contract. Eric Johanson, Cives' sales manager, was then directed to check on the progress of the company's order. On his visit at Lanan's plant in Chicago in company of Callier's Niewoehner on January 3, 1978 (the date called for delivery of the tubes in the purchase order), Johanson found out that Lanan not only had not commenced work on the fabrication of these tubes, but had not received the raw material with which to make the tubes. In addition, it was discovered that Lanan had not been informed about important specifications of the Cives-Callier purchase order such as the 100% weld penetration and backing bar reinforcement requirements. Although Lanan then agreed to comply with these conditions and promised delivery of the tubes in two shipments, respectively on January 13 and January 18, 1978, Cives' managerial team in Maine, after considering Johanson's negative report of his January 3rd visit to the Lanan plant, was skeptical about relying on these proffered delivery dates. At a meeting on the very next day, January 4, 1978, they considered their own delivery date under the Georgia-Pacif-

ic contract, January 23, 1978, to be in jeopardy and decided to cancel the Callier contract. Callier was notified the same day. Factors which entered into the decision to cancel the Callier contract appear as follows: 1) Cives' steel tube contract with Georgia-Pacific involved minor monetary gains compared to the great amount of damages to which the company would be exposed if the multimillion dollar project was delayed in construction by reason of Cives' failure to meet its delivery date; 2) Callier's failure to meet the January 3rd delivery deadline, its disregard of the contract terms requiring company consent on subcontracting the fabrication of the tubes, its non-disclosure of essential contract specifications to the subcontracting firm, its evident reluctance to disclose the identity of the manufacturing outfit, all served to cast doubt on punctual performance and to support Cives' claim of loss of faith in any of the seller's promises for the future.

Unable to find any other steel manufacturer to fabricate the steel tubing to meet the Georgia-Pacific schedule, Cives decided to make the tubes in-house, with the assistance of its New York division. Cives' purchase order to its New York division went out on January 9, 1978 and called for deliveries on the 16th and 23rd of January; this latter date was the stated time for performance under the Georgia-Pacific contract. Up until that time, Cives did not expect that its deadline delivery date would be moved to February 13, 1978, notice of which it received on January 11, 1978. Cives fully performed its contract with Georgia-Pacific which accepted tube deliveries from mid January through the end of March. Georgia-Pacific brought no action against Cives for breach.

Cives brought action in Superior Court against Callier for breach of contract. It sought damages equal to the cost of cover, plus incidental and consequential damages, minus the contract price at which Cives could have gotten the tubing from Callier, if Callier had fulfilled its obligations under the agreement. Cives' cost of production

of the tubes, including a pro-rata share of overhead costs, ran up to $76,884.96, compared to the $28,546.00 contract price with Callier. This wide differential was due in part to Cives' use of A572–50 steel in the manufacturing process; this material was of a higher quality and was more expensive than the A500 or A501 steel called for in its contract with Georgia-Pacific and Callier. Callier counterclaimed for the price of some tubes accepted by Cives after cancellation for which Cives never paid Callier.[2]

After a jury-waived trial, the presiding justice entered detailed findings of fact and conclusions of law. The court concluded that Cives was entitled to "cover" for Callier's breach of contract pursuant to 11 M.R.S.A. §§ 2–711, 2–712 and 2–715, but ruled that Cives was not entitled to a pro-rata share of certain overhead expenses in connection therewith. It awarded Cives $44,-225.91 in cover costs and, after subtracting the contract price of $28,546.00, ordered judgment in favor of Cives in the amount of $15,679.91. On Callier's counterclaim, judgment was ordered in the amount of $1,163.23.

By motion dated May 2, 1983 Cives moved for a new trial and/or for amendment and alteration of the court's findings of fact and conclusions of law. Cives now appeals to this Court from the denial of this motion, questioning the court's refusal to allow its overhead expenses as part of its cover costs, while Callier cross-appeals the entire judgment in favor of Cives.

We begin by addressing the issues raised in Callier's cross-appeal: did Cives have a cause of action, and, if so, was it entitled to the amount of damages allowed?

## I. *Existence of Contract; delivery date of the essence*

■ Callier concedes that a contract of purchase and sale existed between the parties from the opening oral negotiations, but contends that the delivery date of January 3, 1978, never became of the essence of their contract, arguing that such delivery dates are meant to be only approximate and allow flexibility of performance within a reasonable time thereafter. The justice below concluded from the facts of this case that time, meaning January 3, 1978, was of the essence of the contract between Cives and Callier. In this, there was no error.

■ In the first place, the Superior Court justice would have been fully justified in concluding that it would be contrary to normal business practices for Cives to contract with Callier for components of a major construction job and then leave Callier free to perform by any date of its choosing, even on the basis of "within a reasonable time" standard. This factual finding of the Superior Court must be upheld on appellate review unless clearly erroneous. M.R.Civ.P. 52(a). *See Dehahn v. Innes*, 356 A.2d 711, 716–17 (Me.1976) (review of action for breach of parol agreement respecting sale of goods and real estate). A finding is not clearly erroneous if there exists "any competent evidence in the record to support it." *See Estate of Turf*, 435 A.2d 1087, 1089 (Me.1981); *Harmon v. Emerson*, 425 A.2d 978, 981 (Me.1981).

None of the facts to which Callier points supports its contention that the trial justice clearly erred in finding an agreement to deliver by January 3, 1978. First, Callier notes that it never returned Cives' purchase order. This fact only relates to whether Callier ever accepted Cives' offer. Because Callier admits the existence of a contract, the trial justice was not clearly wrong in concluding that Callier was chargeable with knowledge of the date by which delivery was due.

■ Callier also did not object to the delivery date contained in Cives' purchase order, even though the document expressly declared time to be of the essence. The court below could give legal effect to that term of the contract, if

**2.** There is no dispute that Cives owes Callier $1,163.23 for these tubes. Throughout this appeal, both parties have taken the position that this amount would reduce whatever sum might be found to be owed Cives by Callier.

[b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the statute of frauds] against such party unless written notice of objection to its contents is given within 10 days after it is received.

11 M.R.S.A. § 2–201(2) (1964). Callier argues that Cives cannot avail itself of this provision because Cives is not a merchant. In arguing that Cives is not in precisely the same line of manufacturing as Callier, Callier places far too narrow a construction on the term "merchants". Cives Corporation, a steel plate manufacturer involved in a substantial construction contract, is certainly "chargeable with the knowledge or skill of merchants." 11 M.R.S.A. § 2–104(3) (1964). Callier's interpretation of § 2–201(2) would limit it to the rare case where buyer and seller were identically situated companies. A company rarely contracts to buy a product similar to one the company itself manufactures. In *Frantz, Inc. v. Blue Grass Hams, Inc.*, 520 S.W.2d 313, 315 (Ky.1975), the court found that a firm which held itself out as expert in mechanical contracting, which contractually agreed to provide a cooling system, was a merchant with respect to the goods furnished under the agreement, even though the firm subcontracted for the supply of the cooling equipment. Similarly, Cives has held itself out to Georgia-Pacific as a merchant in the field of steel supplier and/or manufacturer, and Callier dealt with Cives as such. The purpose of § 2–201(2) is to impose greater restrictions on merchants than on consumers. Both Cives and Callier are in the field of manufacturing steel products, whether it be of the plate or tubular variety. When dealing together, the statute terms their transaction one "between merchants," *i.e.* with respect to a subject matter to which both parties are chargeable with the knowledge or skill of merchants. 11 M.R.S.A. § 2–104(3) (1964). *See Uniform Commercial Code* § 2–104 comment 1, *reprinted* in 11 M.R.S.A. § 2–104 (1964).

Callier further contends that by subcontracting with Lanan for delivery by January 5, 1978, Callier showed its lack of agreement to any January 3, 1978, delivery date. The trial court could justifiably find that this date was the best deal Callier could get from Lanan; it need not have been viewed as a repudiation of the delivery term of the Cives contract.

Callier failed to give any notice to Cives that it objected to the delivery date of January 3, 1978, let alone the 10 days written notice of objection provided by 11 M.R.S.A. § 2–201(2); not having protected itself through the use of this statutory escape provision, Callier cannot now complain about the court's finding that time was of the essence of the contract and that the defendant was guilty of a breach thereof.

## II. *Waiver*

Callier argues that Cives waived any objection to a late delivery. This waiver allegedly occurred in a mid-December conversation between Cives and Callier representatives and during the January 3, 1978, visit by Cives' Johanson to Chicago. Assuming such a waiver, a fact which was not articulated by the presiding justice in his findings, Cives, under 11 M.R.S.A. § 2–209(5) (1964), was entitled to retract it by reasonable notification unless "[t]he retraction would be unjust in view of a material change of position in reliance on the waiver." Callier's only claim of material reliance assumes that it could have found an alternative source of tubing, had Cives not waived the delivery date. This assumption is unsupported by the facts of record.

## III. *Cancellation*

Callier argues that Cives did not give the three days notice of cancellation required by paragraph 9 of the purchase order. This is correct; Cives' letter of January 4, 1978, constituted a repudiation which did not explicitly give Callier three days notice to deliver goods. The effect of the three days notice provision would be to give Cal-

lier three days in which to perform after the January 4, 1978 notice of repudiation. Callier did not deliver any goods, nor did it attempt to do so, within the subsequent three day period and the record demonstrates that such expedited performance was beyond Callier's capability at that time.

## IV. *Cover*

■■■ 11 M.R.S.A. § 2–712 (1964) provides that upon breach by a seller, "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Also, "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages ..., but less expenses saved in consequence of the seller's breach." At the January 3rd meeting, Cives learned for the first time that Callier had subcontracted the job to Lanan and that Lanan would not be able to perform by the agreed-upon time. Callier argues that this meeting gave sufficient assurances of Lanan's eventual performance to make Cives' resort to cover unnecessary. The trial court had before it evidence from which it could conclude that Cives acted in good faith in seeking substitute goods. Cives had no prior dealings or contractual agreement with Lanan. Lanan gave no indication of its concern for Cives' deadline, at least not until Cives had to send a representative to check up on the progress of its contract with Callier. Lanan at that time did not even have the material needed on hand and was unaware of some of the essential basic contract specifications. Under these circumstances, Cives had good reason not to rely upon Lanan. Because of the huge liability to which Cives would be exposed in the event it could not provide the steel for the Plattsburg project on time, Cives was entitled to use a great deal of caution before trusting Lanan's promises of expeditious performance.

The record supplies sufficient evidence to rebut Callier's contention that Cives was not justified in producing the goods in-house. Cives did not resort to in-house cover, until after conducting a thorough search for an alternate supplier. Cives knew its own capabilities and correctly determined that it could, with some extra effort and expense, produce the required steel tubes. Under such circumstance, resort to in-house cover is a legitimate business decision. *See Dura-Wood Treating v. Century Forest Industries,* 675 F.2d 745, 753 (5th Cir.1982).

As a result of resorting to in-house cover at the last minute, Cives' cost of producing the tubes was greater than the contract price. Neither of the items of extra expense encountered by Cives demonstrates that the Superior Court clearly erred in finding Cives' cover in good faith. *See Id.* at 754 (fact that hindsight shows cover not to be the cheapest method does not make cover one of bad faith). Cives used A572–50 steel instead of the cheaper A500 or A501 steel called for in the contract, because of the type of manufacturing process Cives used. According to the testimony at trial, Cives is a steel plate maker and A500 or A501 steel are specifications for steel tubes at the mills, but are not otherwise available on the steel plate market. After making the steel plates with A572–50, Cives would bend the plates into steel tubes. A tube maker such as Callier could have used the cheaper steel to make steel tubes eliminating the intermediate step of using steel plates. Likewise, the extra manhours devoted to Cives' cover stems from the difference in the manufacturing process between Cives and Callier. Callier does not suggest that either the manhours or A572–50 steel were not actually devoted to the cover project. These expenses do not show that Cives acted in bad faith in deciding to cancel the contract and produce the tubes in-house. The extra expense involved in Cives' cover is a small fraction of the liability to which Cives would have been exposed, had it delayed the Georgia-Pacific project by even one day. Callier does not

argue, nor could it, that Cives gained some benefit by supplying higher quality steel than called for in the contract specifications. The record does not reveal that Cives profited financially or gained some extra goodwill by its furnishing this particular steel to Georgia-Pacific. *See* J. White & R. Summers, *Uniform Commercial Code* § 6–3, at 221 (2d ed. 1980).

## V. *Evidence of costs of cover*

Callier argues that Cives did not produce proper evidence of its costs of cover. At trial Martin Keniston, a Cives accountant, testified to Cives' costs of cover. In preparation for trial Mr. Keniston put together an exhibit listing Cives' costs. This list was ruled inadmissible as hearsay. Because the summary exhibit was excluded, Keniston used it only as a device to explain the basis for his calculations. Keniston testified that he had all of the original records and data with him at trial. At the close of Keniston's testimony counsel for Callier moved to strike his calculations as hearsay. The record does not reveal how the Superior Court ruled on this motion.

On appeal Callier argues that the Best Evidence Rule, M.R.Evid. 1002, requires that the original cost records should have been introduced. Callier's trial objection on hearsay grounds does not preserve a best evidence objection on appeal. *See* M.R.Evid. 103(a)(1). A specific objection preserves only that ground for appeal, whether the objection is sustained or overruled. *See Lee v. Oppenheimer*, 34 Me. 181, 185 (1852) ("Every position respecting the admissibility of testimony should be distinctly presented to the presiding Judge for decision, before it can be made the subject of exception [now appeal].") All objections not so specifically stated are held to be waived. *Michaud v. Steckino*, 390 A.2d 524, 531–32 (Me.1978).

The hearsay objection, which Callier properly preserved, does not warrant the exclusion of Keniston's testimony. M.R.Evid. 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation. The original shall be made available for examination or copying, or both, by other parties at a reasonable time and place.....

Keniston brought the originals to court and Callier does not argue that it was denied access to these materials. Under this rule, therefore, Keniston's testimony based upon his review of the voluminous Cives records was admissible to show the costs of cover. Also, under M.R.Evid. 703 an expert, such as Mr. Keniston, may testify to conclusions on the basis of materials made known to him whether or not those materials were themselves admitted in evidence, where, as here, the data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.

Therefore, we find no reversible error in any of the issues raised on the cross appeal.

## VI. *Overhead expenses*

In its appeal, Cives argues that the Superior Court erred in denying it the pro-rata share of overhead expenses it allocates to the cover project. Under 11 M.R.S.A. § 2–712(2), the buyer may recover from the seller as damages

> the difference between the cost of cover and the contract price together with any incidental or consequential damages ...

Thus, it is claimed that Cives could recover any costs actually occasioned by the making of the cover goods, even though in the instant case Cives itself produced the cover goods. Cives argues that production costs in this case include proportionate general overhead expenses allocable to the making of the cover goods.

Overhead expenses or indirect costs allowable as incidental damages in effecting "cover" consist generally of the expenses of a business enterprise for salaries of executives, central office staff personnel, rent, communications, vehicles, util-

ities, interest on borrowed capital and numerous other expenses which are extremely necessary for the operation of the business, but which are not directly attributable to a particular job or project. *See McCarty Corp. v. Industrial Scaffolding,* 413 So.2d 1322, 1324 (La.App.1981). Here, Cives sought the recovery of $32,659.05 over and above the amount of $44,225.91 which the court found recoverable as allowable costs of cover. There is no dispute between the parties that, if such overhead expenses were recoverable, the method of their calculation in this case was in accordance with sound and recognized accounting principles. But we agree with the court below that in this case the disallowance of some of these expenses was proper.

In order to recover overhead expenses in effecting cover Cives had to establish not only that a portion of its resources was unavailable for other projects for the time when it was effecting cover, but also that it had to forgo the performance of other available construction projects. Recoverable proportionate overhead expenses must represent not only an expense, but a loss, *i.e.* it must be shown that other jobs would have been obtained to absorb such overhead, but had to be given up because of the cover undertaking. *See Kansas City Bridge Co. v. Kansas City Structural Steel Co.,* 317 S.W.2d 370, 376–77 (Mo.1958); *Guy James Const. Co. v. Trinity Industries, Inc.,* 644 F.2d 525, 532–33 (5th Cir.1981); *W.G. Cornell Co., Etc. v. Ceramic Coating Co.,* 626 F.2d 990, 994 (D.C.Cir.1980); *Oakland California Towel Co. v. Sivils,* 52 Cal.App.2d 517, 126 P.2d 651, 652 (1942). *But see Southern New England Contracting Co. v. State,* 165 Conn. 644, 345 A.2d 550 (1974); *General Insurance Co. of America v. Hercules Construction Co.,* 385 F.2d 13 (8th Cir. 1967).

The evidence at trial supports the court's conclusion that the cover project did not cause Cives to lose any other work. *Although* the evidence showed that Cives had to postpone some other work, there was neither testimony that Cives operated at such a high capacity that it was unable to complete the work that it had on hand, nor that it lost project opportunities because of the cover work undertaking. Hence, the trial court did not err in concluding that Cives had not proven its entitlement to the total amount of the overhead expenses it allocated as part of the cost of cover in this case.

The entry is:

Appeal denied. Cross-appeal denied.

Judgment of the Superior Court in favor of Plaintiff Cives Corporation on its complaint affirmed.

Judgment of the Superior Court in favor of Defendant Callier Steel Pipe & Tube, Inc. on its counterclaim affirmed.

The parties to bear their respective costs of appeal.

All concurring.