**BAYER CORPORATION n/k/a
Bayer MaterialScience
L.L.C., Appellant,**

v.

**DX TERMINALS, LTD., Appellee.**

No. 14–05–00931–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 12, 2006.

Rehearing Overruled Jan. 25, 2007.

Reagan M. Brown, Ira Claborn Rogers and Joy M. Soloway, Houston, for appellants.

Jesse R. Pierce and Sheryl Anne Falk, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and SEYMORE.

## OPINION

ADELE HEDGES, Chief Justice.

Bayer Corporation, now known as Bayer MaterialScience L.L.C., appeals from a judgment awarding damages to DX Termi-

nals, Ltd. DX sued Bayer for breach of contract, alleging Bayer failed to comply with an agreement for the sale of caustic soda from Bayer to DX. DX also claimed that Bayer intentionally interfered with DX's contractual relationship with one of its customers. In turn, Bayer counterclaimed against DX, also alleging breach of contract. A jury found that each side failed to comply with the agreement, that DX suffered $7.5 million in damages as a result of Bayer's breach, and that Bayer suffered $40,000 as a result of DX's breach. The jury further found that Bayer did not intentionally interfere with DX's contractual relationship. The trial court offset the award to Bayer against DX's recovery and awarded DX $7,460,000 as actual damages, as well as prejudgment interest of $512,273 and post-judgment interest at 6 percent. The court additionally ordered each side to pay its own costs.

On appeal, Bayer contends that the trial court erred in (1) refusing to grant Bayer's motion for a directed verdict when the evidence conclusively established that DX's material breach of the contract substantially impaired the value of the whole contract to Bayer; (2) refusing to disregard as immaterial the jury's finding that Bayer failed to comply with the contract; (3) refusing to grant Bayer's motion to disregard jury findings where the evidence was legally and factually insufficient to support the finding that Bayer failed to comply with the contract; (4) refusing to provide the jury with additional instructions regarding Bayer's right to cancel the contract when the jury sent out a note requesting such instruction; (5) admitting the testimony of DX's damages expert, which was based on improper methodology and improper foundation; (6) awarding DX damages for lost profits when such were precluded by the contract and applicable law; and (7) awarding DX damages and failing to suggest a remittitur when the evidence was legally and factually insufficient to support the jury's damages award. In a cross-appeal, DX contends that the trial court erred in calculating prejudgment interest and in ordering each side to pay its own costs. We affirm.

## I. Background[1]

In 1998, Bayer and DX entered into a monthly installment contract for the sale of caustic soda from Bayer to DX. Caustic soda is a by-product of chlorine production, and Bayer had begun construction of a "Chlor–Alkali" unit at its Baytown, Texas facility. Bayer needed a buyer for the caustic soda. DX planned to resell the soda to affiliated companies (which used the caustic soda in producing bleach) as well as to outside customers, including principally Davison Petroleum. Under the contract, Bayer agreed to sell and DX agreed to buy between 135,000 and 150,000 dry short tons of caustic soda per year (or 11,250 to 12,500 tons per month) for a five-year period beginning in February 1999. Although the contract called for distribution of the annual amounts in equal monthly volumes, there was evidence at trial that this equality of monthly volumes was "artificial," and that the parties understood that exactly equal amounts would be impossible. The contract also specified that certain volumes would be shipped each month by rail car, by tanker truck, and by barge. Pricing under the contract was to be calculated based on the lowest of three possible measures of price minus $27.50 per ton. The three possible measures were (1) the "contract price" for caustic

---

1. This section of the opinion presents general background information regarding the parties' relationship and significant events leading to the present litigation. More detailed facts are included where relevant in the substantive discussion that follows.

soda published by Chemical Market Associates, Inc., (2) the "spot price" published by CMAI, and (3) DX's average purchase price for non-Bayer caustic soda for the current month. Thus, DX's price was $27.50 less per ton than the lowest of three market measures.[2]

Disputes between the parties arose early in the contract period. For example, the parties bickered over who was to set the annual volumes and who was at fault for apparent logistical problems. DX contends that because Bayer's Chlor–Alkali unit was unprofitable and Bayer became convinced that the contract was too advantageous for DX, Bayer engaged in a scheme to restrict the volumes of caustic soda sold to DX. DX supported this assertion at trial with various internal Bayer documents. DX further contended that the restriction of volumes to below the required contract minimums breached the contract.

In 2000, Bayer began selling caustic soda directly to Davison, who was DX's largest external customer. In December 2000, DX notified Davison that it was cancelling their contract effective December 31, 2001. Although the precise reasons for this cancellation are unclear, Davison was apparently to some degree dissatisfied with DX's service under the contract, and DX may have believed that it could make more money selling caustic soda to other customers. Davison stopped ordering caustic soda from DX in May 2001, well before the cancellation date. From May through August 2001, DX removed substantially less caustic soda from Bayer's facility than the contract required. Bayer contended at trial that the buildup of caustic soda inventories occasioned by DX's failure to remove contract minimums

threatened an inventory emergency that could have caused Bayer to shut down its entire Baytown facility, resulting in millions of dollars in lost profits. On September 11, 2001, Bayer terminated the contract, stating as its reason, "DX's continuing failure to take and pay for at least 135,000 dry short tons per year, in equal monthly volumes."

DX sued Bayer for breach of contract and tortious interference with DX's contractual relationship with Davison. Bayer counterclaimed for breach of contract based on DX's failure to remove the required amounts of caustic soda. At trial, the parties offered competing evidence regarding who was at fault for contract shortfalls and difficulties in processing orders, whether DX's failure to take contract minimums during certain months substantially impaired the value of the whole contract to Bayer, and whether Bayer's alleged impending inventory crisis was real or merely a justification for cancelling the contract. DX's expert witness on damages, Ron Vollmar, calculated that DX suffered pre-cancellation damages of $1.6 million and post-cancellation damages of $13.1 million. Bayer presented evidence that it suffered $40,000 in demurrage charges for caustic soda that was loaded on barges in March 2001 but which DX did not take.

During deliberations, the jury sent out a note asking: "Provided that there is no cancellation clause in the contract, will cancellation in itself constitute a breach of contract?" Although Bayer's counsel argued that the correct answer to the jury's query was "no," and that barring that answer, the court should read several UCC sections to the jury, he further stated that the court had already given the

**2.** Although the contract provided that if the price calculation fell below zero, Bayer would not have to pay DX to take caustic soda, there is no indication in the record that this possibility ever occurred.

jury a correct charge. The trial judge responded to the jury's query by instructing: "Please answer the question in accordance with the instructions given and the Charge." The next day, Bayer's counsel tendered a proposed written instruction regarding cancellation, which the court denied.

The jury found that both parties breached the agreement but that Bayer did not tortiously interfere with DX's contractual relationship with Davison. The jury awarded DX $7.5 million for Bayer's breach, and it awarded Bayer $40,000 for DX's breach. The trial court entered judgment in accordance with the jury verdict, calculating pre-judgment interest from December 31, 2003, the last day that the contract would have been enforced, and ordered each party to pay its own costs.

## II. Substantial Impairment

In its first issue, Bayer contends that the trial court erred in refusing to grant its motion for a directed verdict. It reasons that because the evidence conclusively established that DX's material breach substantially impaired the value of the whole contract, Bayer was justified in cancelling and cannot be held liable for damages. We review this matter-of-law issue under the well-established standards. *See City of Keller v. Wilson,* 168 S.W.3d 802, 814–816, 823 (Tex.2005).

■ In the contract, the parties agreed that Pennsylvania law would gov-

ern any disputes.[3] On appeal, the parties specifically agree that the contract at issue is an installment contract for the sale of goods governed by the Pennsylvania version of the Uniform Commercial Code.[4] Under the UCC, when one party to an installment contract defaults with respect to one or more installments and thereby substantially impairs the value of the whole contract to the other party, such default constitutes a breach of the whole contract. PA. CONS.STAT. § 2612. When such a breach occurs and the nonbreaching party is the seller (as Bayer was here), the seller has the right, among other options, to cancel the contract. *Id.* § 2703. Bayer contends that the evidence established, as a matter of law, substantial impairment of the value of the whole contract as a result of DX's breach. Therefore, Bayer argues, it was justified in canceling the contract and is not liable for any damages for post-cancellation nonperformance.

■ It is possible to conclusively establish substantial impairment of the value of a whole contract. *See, e.g., L & M Enters. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1288 (10th Cir.2000); *Design Plus Store Fixtures, Inc. v. Citro Corp.,* 131 N.C.App. 581, 508 S.E.2d 825, 830 (1998). However, given the subjective nature of this issue, it is typically regarded as an issue of fact for the jury. *See, e.g., Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.,* 944 F.2d 1131, 1148 (3d Cir.1991); *Extrusion Painting, Inc. v. Awnings Unlimited, Inc.,* 37

3. When parties have contractually chosen the law of another state to govern disputes, matters of remedy and procedure are still governed by Texas law in Texas courts. *E.g., In re Wells Fargo Bank Minn. N.A.,* 115 S.W.3d 600, 605 n. 7 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding).

4. Although the parties agree that Pennsylvania law governs the dispute, both sides cite case law from Texas and other jurisdictions

interpreting the UCC. Under Pennsylvania law, opinions from other jurisdictions interpreting the UCC are considered persuasive if they involve provisions that are substantially similar to the relevant Pennsylvania UCC provisions. *Cont'l Ins. Co. v. Schneider, Inc.,* 582 Pa. 591, 873 A.2d 1286, 1293 n. 10 (2005). Neither side has identified any distinctions between the Pennsylvania UCC and the UCC versions in the other cited jurisdictions.

F.Supp.2d 985, 997 (E.D.Mich.1999); *Emanuel Law Outlines, Inc. v. Multi–State Legal Studies, Inc.*, 899 F.Supp. 1081, 1087 (S.D.N.Y.1995); *Valley Timber Sales, Inc. v. Midway Forest Prods., Inc.*, 563 So.2d 612, 613–14 (Ala.Civ.App.1990). In the present case, neither the evidence nor the case law supports Bayer's contention that it proved substantial impairment as a matter of law.

■ At trial, Bayer presented evidence that DX failed to take required contract minimums of caustic soda for four consecutive months: May through August 2001.[5] Bayer also presented evidence of the benefit derived from the contract: having a consistent buyer for the caustic soda generated as by-product from chlorine production. Bayer witnesses testified that the company had no experience in caustic soda sales or distribution. It was therefore willing to give a discount to DX because DX was to handle the logistics concerned with receiving the caustic soda from Bayer. Bayer witnesses also testified that the company had limited storage space for caustic soda and that when DX did not take contract minimums, inventory levels began to climb to heights threatening to halt chlorine production. Witnesses further asserted that if chlorine production halted, the resulting domino effect could have closed production at Bayer's entire Baytown facility. There was also testimony from some of DX's expert witnesses that this impending inventory crises was a real possibility.[6] In summary, Bayer's evidence established a prima facie case that

---

5. The Pennsylvania Supreme Court has stated that when the parties to a contract agree that the goods will be delivered in equal installments, the buyer is generally obligated to take at least the minimum quantity. *See Diamond Alkali Co. v. Aetna Explosives Co.*, 264 Pa. 304, 107 A. 711, 712 (1919).

6. Bayer states that DX's industry experts, Jack Clinton and John Hanson, concluded that DX's failure to take target minimums in May through August of 2001 substantially impaired the value of the contract to Bayer. This assertion is not completely justified based on the actual testimony. Jack Clinton agreed to the general propositions that if Bayer exceeded its storage capacity it would be problematic and that selling excess caustic soda on the spot market could be troublesome for Bayer. He further agreed that the principal value of the contract to Bayer was dependable removal of caustic soda. The following exchange then occurred:

Q. [I]f the buyer has lost the outlet for 40 to 50 percent of the product it has to take away and hadn't replaced it for four months since that outlet said that we are going for good, Bayer had lost the value of this contract, hadn't it?
A. Bayer has a problem with its contract.
Q. They have lost the value of the contract to them because the value of the contract is taken away—the excess caustic, right?
A. That was their plant, yes.

Clinton's testimony, however, does not have to be read as concluding that DX's conduct substantially impaired the value of the whole contract to Bayer. Clinton was asked a hypothetical regarding a 40–50% drop in orders for four months, but the evidence only showed about a 38% drop in orders for the four month period. The hypothetical also does not take into account that (as discussed in the text following this footnote) there was evidence Bayer's inventory levels did not threaten a shutdown and Bayer had an outlet through its sales to Davison.

John Hanson testified that the value of the contract to Bayer was for DX to take the caustic soda away and that Bayer had limited inventory capacity. Hanson was then asked a hypothetical as follows: "if the inventory situation had built up such that this company had lost its biggest customer and was not even coming close to ordering the minimum and the inventories were to the point where they were looking at that plant shut down, Bayer had lost a substantial value of this contract, hadn't they?" To this question, Hanson gave a qualified "yes." However, just as with Clinton's testimony, the offered hypothetical assumed a dangerous inventory level, regarding which the evidence was hotly contested. It is also worth mentioning that neither Clinton nor Hanson was asked whether DX's conduct substantially impaired the value of the *whole* contract; it is therefore unclear whether their

DX's failure to take contract minimums over a four-month period materially breached the contract and substantially impaired the value of the whole contract to Bayer. However, in determining whether Bayer conclusively proved this proposition at trial, we do not simply look at Bayer's evidence but must examine DX's as well. *See City of Keller,* 168 S.W.3d at 814–816, 823.

We first consider the actual totals taken by DX during the four-month period of the alleged breach. DX agreed to "take or pay" a minimum of 135,000 dry short tons of caustic soda per year. The contract states that sales were to be "in equal monthly volumes": 135,000 tons per year equates to a minimum of 11,250 tons per month. Aleta Richards, the head of Bayer's Inorganic Basic Chemicals Marketing Group (which oversees caustic soda sales), testified that this equality of monthly volumes was "artificial" and the parties understood that exactly equal amounts would be impossible. In May, DX removed 6,504 tons from Bayer (or 58 percent of the target monthly minimums); in June, DX removed 7,074 tons (or 63 percent), in July, DX removed 6,305 tons (or 56 percent); in August, DX removed 8,186 tons (or 73 percent). In total, DX removed 16,931 fewer tons than the target monthly minimums for these four months. Stated in percentage terms, the removal represented 38 percent less than the target monthly minimums for those four months, 12.5 percent less than the minimum DX was supposed to remove annually, and less than 3 percent of the minimum over the life of the contract (59 months). While these calculation do not by themselves necessarily prove that DX's failure to comply did or did not substantially impair the value of the whole contract, it places the failure to comply for those four months in perspective of the monthly, annual, and contract totals.

Additionally, DX presented evidence that neither these nor previous shortfalls in removing monthly minimums were not deemed a problem by Bayer at the time they occurred, and in fact, were possibly caused by Bayer. There was substantial evidence that Bayer developed a policy to sell DX only the minimum required under the contract; Bayer then rejected numerous DX orders and failed to deliver required amounts on several occasions.[7] Indeed, internal Bayer correspondence offered by DX demonstrated that Bayer had incentives to reduce the amount of shipments to DX: Bayer believed that the contract was too favorable to DX, and Bayer wanted to sell caustic soda directly to Davison and others for greater profit.[8]

DX also presented evidence suggesting that Bayer's assertion of an imminent in

---

responses to the hypotheticals suggested substantial impairment to the individual installments or the whole contract.

Furthermore, even if Clinton and Hanson's testimony can be read as concluding that DX's conduct substantially impaired the value of the whole contract to Bayer, this would still not render the evidence conclusive in this regard. As is discussed in the text, DX offered significant evidence that its conduct did not substantially impair the value of the whole contract to Bayer.

7. Bayer points out that the contract called for specific amounts to be shipped via particular methods and that Davison was DX's only barge customer. Thus, when DX lost Davison as a customer, DX had difficulty taking the specified amounts by barge. Although relevant, these facts do not refute the evidence that Bayer rejected numerous DX orders and failed to deliver required amounts on several occasions.

8. One particular internal email from Aleta Richards, head of Bayer's marketing group which oversaw caustic soda sales, is illustrative: "[L]et's not schedule/arrange barges for DX.... [E]very pound that he cannot take during a given month, is more material that we will be able to reroute to Davison and others."

ventory crisis in the summary of 2001 was fictitious. Both Bayer and DX employees testified that Bayer did not complain to DX about the shortfalls in the summer of 2001. Indeed, there was evidence that inventory levels during this period of time did not rise appreciably higher than they had been during earlier contractual periods. Further, Bayer had an outlet for excess caustic soda through its direct sales to Davison. Bayer has offered no explanation as to how cancellation of the contract with DX would relieve its alleged inventory problem.[9]

In summary, although Bayer presented some evidence that DX's failure to take contract minimums for four consecutive months substantially impaired the value of the whole contract to Bayer, evidence submitted by DX supported the opposite conclusion: that the shortfalls did not substantially impair the value of the whole contract to Bayer and that Bayer used the shortfalls as a pretext for cancellation.

The cases cited by Bayer in support of the proposition that substantial impairment can be proven as a matter of law are clearly distinguishable on their facts. For example, in *L & M Enterprises*, the court held that the seller established substantial impairment as a matter of law where there was an undisputed and complete failure by the buyer to pay for installment shipments. 231 F.3d at 1288. Similarly, in *Design Plus Store Fixtures*, the court held that the buyer proved substantial impairment as a matter of law where the goods delivered in the first two of three scheduled installments were not useable as delivered. 508 S.E.2d at 830. In contrast, it cannot be said that DX wholly failed to perform for four months. DX performed, at least partially, by taking approximately 62 percent of the monthly targets for those four months. Whether this partial performance substantially impaired the value of the whole contract to Bayer was a question of fact, particularly in light of the evidence propounded by DX.[10]

Bayer failed to prove as a matter of law that DX's conduct substantially impaired the value of the whole contract to Bayer. Accordingly, Bayer's first issue is overruled.

### III. Materiality of Jury Findings

■■■ In its second issue, Bayer assigns as error the trial court's refusal to

---

It should be noted that Bayer also produced evidence in the form of correspondence with DX showing Bayer's complaints about earlier, pre–2001 shortfalls. However, DX's evidence suggest that Bayer's letters may have been mere subterfuge and would not be particularly relevant to the 2001 shortfalls.

9. The fact that Bayer had other outlets for caustic soda would not by itself prove that DX's conduct had not substantially impaired the value of the contract to Bayer. However, such evidence casts doubt on Bayer's assertion that it was facing an imminent inventory crises in the summer of 2001.

10. Bayer cites several other cases in support of the proposition that substantial impairment can be proven as a matter of law; however, each of these additional citations is not only distinguishable but also of less value to the current analysis than either *L & M Enterprises* or *Design Plus Store Fixtures*. See *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195 (Tex.2004) (not an installment contract or "substantial impairment" case); *Am. Tube & Stamping Co. v. Erie Iron & Steel Co.*, 281 Pa. 10, 125 A. 304 (1924) (not a UCC case); *United Trading & Shipping, Inc. v. Commonwealth Ins. Co.*, Civ. A. No. 94–4742, 1999 WL 712585 (E.D.Pa. Sept. 10, 1999) (unreported case); *Hooker v. Nguyen*, No. 14–04–00238–CV, 2005 WL 2675018 (Tex.App.-Houston [14th Dist.] Oct. 20, 2005, pet. denied) (memo.op.) (not an installment contract or "substantial impairment" case); *Mold–Tech USA, LLC v. Holley Performance Prods., Inc.*, No. E2004–01938–COA–R3–CV, 2005 WL 2051289 (Tenn.Ct.App. Aug.26, 2005) (unreported case).

disregard as immaterial the jury's finding that Bayer failed to comply with the contract. A trial court may disregard a jury finding if it is immaterial or unsupported by evidence. *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). A finding is considered immaterial when the issue should not have been submitted to the jury, or when it was properly submitted but has been rendered immaterial by other findings. *Id.* Here, Bayer specifically contends that in finding a failure by DX to comply with the agreement, the jury necessarily found that DX substantially failed to perform; thus, Bayer was excused from further performance. We find that Bayer's argument is not supported by the language in the charge.

Question No. 1 reads as follows:

## QUESTION NO. 1

■ Did Bayer Corporation or DX Terminals, Ltd. fail to comply with the Sales Contract?

In answering this question, you are instructed that:

Failure of a party to a contract to perform in accordance with its terms gives the other party a cause of action for breach. A breach of contract occurs when a party to the contract fails to perform any contractual duty of immediate performance, or violates an obligation, engagement or duty.

Not every nonperformance, however, is to be considered a breach of contract. If you find that the nonperformance was trivial, and thus that the contract was substantially performed, you must also find that the breach of the contract has not occurred.

Whenever non-conformity or default with respect to one or more installments of a contract substantially impairs the value of the whole contract, there is a breach of the whole.

In interpreting the contract, the intent of the parties should be determined solely from the express language of their agreement if the words of the contract are clear and unambiguous. However, if you find from the evidence that a particular custom or trade usage actually existed when the contract was made and the custom or trade usage evidence does not contradict the express terms of the contract, you may also consider evidence of custom or trade usage in determining the parties' contractual intent.

In addition to the language of the agreement, the law imposes on the parties to a contract the duty to perform the contract with honesty in fact and to observe the reasonable commercial standards of fair dealing in the trade.

Answer "Yes" or "No" for each of the following:

 a. Bayer Corporation *Yes*

 b. DX terminals, Ltd. *Yes*

In answering "yes," the jury found that DX failed to substantially perform.[11] The charge, however, does not define "substantially perform" other than by reference to whether a given breach was trivial or not. The charge equates a finding of substantial performance of the contract with a finding that any nonperformance was merely trivial in nature. Further, if any nonperformance is merely trivial (and thus the contract was substantially performed), the nonperforming party is not liable for a breach of contract. And, stated conversely, if a nonperformance is not trivial in

---

**11.** The legal doctrine of substantial performance generally permits a party to a contract that breaches nonmaterial terms (but has otherwise substantially performed) to sue the other party to the contract for breach. *Patel v. Ambassador Drycleaning Co.,* 86 S.W.3d 304, 306 (Tex.App.-Eastland 2002, no pet.).

nature (and thus the contract was not substantially performed) then the nonperforming party is liable for breach of contract.

■■■ Bayer takes this a step further and argues that DX's breach completely excused Bayer's performance and justified its cancellation of the contract. This argument, however, ignores the context in which DX's alleged breach occurred. In the installment contract context, one party can materially (or nontrivially) breach in regard to one or more installments (thus entitling the nonbreaching party to damages) without substantially impairing the value of the whole contract to the nonbreaching party and, hence, without excusing the nonbreaching party's further performance. *See, e.g.,* PA. CONS.STAT. § 2612(c) & cmt. 6 (providing for actions seeking damages only for default on an installment); *Arkla Energy Res., A Div. of Arkla, Inc. v. Roye Realty & Developing, Inc.,* 9 F.3d 855, 863 (10th Cir.1993) (holding that even though delay in delivery did not substantially impair the value of the whole contract, nonbreaching party could still recover damages due to uncured breach of installment); Gregory M. Travalio, *The UCC's Three R's: Rejection, Revocation and (the Seller's) Right to Cure,* 53 U. Cin. L.Rev. 931, 1002 (1984) (stating that if a party defaults in regard to one installment, the nonbreaching party's remedy lies in damages, and "only very serious breaches" were meant to enable a nonbreaching party to cancel the contract); *see also Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.,* 965 F.Supp. 1003, 1015–16 (W.D.Mich.1997) (analyzing default on one installment separately from substantial impairment of the whole contract).[12] Indeed, in support of its argument that the finding of DX's breach rendered the finding of Bayer's breach immaterial, Bayer cites only two cases, neither involving installment contracts. *See Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195 (Tex.2004); *Hooker v. Nguyen,* No. 14-04-00238-CV, 2005 WL 2675018 (Tex.App.-Houston [14th Dist.] Oct. 20, 2005, pet. denied).

We believe that in finding DX's failure to comply, the jury did not consequently find that DX substantially impaired the value of the whole contract to Bayer. While Question No. 1 includes a sentence explaining that when default on one or more installments substantially impairs the value of the whole contract, there is a breach of the whole contract, this sentence does not state the contrary: that a default on one or more installments not substantially impairing the value of the whole cannot be a breach of contract. Thus, the jury's finding of DX's failure to comply with the contract is not axiomatically converted into a finding that DX's breach substantially impaired the value of the whole contract to Bayer.[13] In other words,

---

12. In *Midwest Mobile,* the court stated that substantial impairment of an *individual* installment (under UCC section 2612(b)) may be judged by reference to the concept of material breach under traditional contract law. 965 F.Supp. at 1013. However, in analyzing substantial impairment of the *whole* contract (under UCC section 2612(c)), the court referenced only the requirements under the UCC and did not reference traditional material breach principles. *Id.* at 1015–16. The clear implication is that a showing of substantial impairment of the value of the whole contract requires more than a mere showing of material breach of one or more installments.

13. During the hearing on entry of judgment, the trial judge seemed to suggest that the substantial impairment sentence in the charge merely directs the jury that if they find substantial impairment of the value of the whole contract then they must find a breach of contract. He went on to suggest that a finding of material breach does not necessarily translate to a finding of substantial impairment of the whole. This is a logical reading of the charge

the charge leaves open the possibility that the jury could have found that DX defaulted on one or more installments (thus entitling Bayer to damages) but did not substantially impair the value of the whole contract to Bayer. Because the finding of DX's breach is not tantamount to a finding of substantial impairment, the finding on Bayer's breach was not immaterial.[14] Because there is no finding, implied or explicit, that DX's breach substantially impaired the value of the whole contract to Bayer, we overrule Bayer's second issue.

## IV. Sufficiency of Evidence Re: Breach

In its third issue, Bayer contends that the evidence was legally and factually insufficient to support the jury's finding of its failure to comply with the contract. *See City of Keller,* 168 S.W.3d at 822 (providing standards for legal sufficiency review); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (providing standards for factual sufficiency review). Although Bayer acknowledges that it cancelled the contract on September 11, 2001, and failed to comply with the contract terms after that date, it argues that there is no evidence of its failure to comply prior to DX's breach. Bayer also contended above that it was justified in cancelling the contract because DX's prior breach substantially impaired the value of the whole contract. Thus, Bayer has argued that (1) the evidence was legally and factually insufficient to support a finding that it breached prior to DX's breach, and (2) Bayer's cancellation of the contract was justified due to

DX's breach. Bayer therefore concludes that DX was not entitled to damages incurred either before or after DX breached.

Jury Question No. 1, however, is not bifurcated in this manner; it does not segregate Bayer's alleged breaches into categories of before and after DX's breach. Moreover, we considered and rejected the justification argument above, and Bayer acknowledges its cancellation of the contract. Accordingly, we find that the evidence is sufficient to support the jury finding that Bayer breached the contract. Bayer's arguments regarding what damages are available (based in part on when alleged breaches occurred) are better addressed below in the discussion of the issues relating to damages calculations. Bayer's third issue is overruled.

## V. Additional Instructions

In its fourth issue, Bayer contends that the trial court erred in refusing to supplementally instruct the jury when the latter sent out a note asking whether cancellation of the contract could constitute breach of the contract. *See* Tex.R. Civ. P. 286 (permitting trial court to additionally instruct jury after they have retired for deliberations). DX contends that Bayer failed to preserve any alleged error by omitting to make a timely and sufficiently specific objection in the trial court. *See* Tex.R.App. P. 33.1(a); Tex.R. Civ. P. 272, 274, 278. We agree with DX.

### A. Sequence of Events

At the conclusion of its case, Bayer's counsel asked the trial judge to judicially

---

language in context, comporting with the trial court's ultimate decision not to disregard the finding of Bayer's failure to comply based on the same arguments Bayer now makes on appeal.

**14.** Interestingly, Bayer's own proposed charge clearly differentiates the discussion of

trivial nonperformance and substantial performance from that regarding substantial impairment of value, stating that a breach of one installment does not equate to a breach of the entire contract and entitles the nonbreaching party only to damages relating to that installment.

notice several sections from the Pennsylvania UCC, including sections 2106 (concerning cancellation), 2610 (concerning anticipatory breach), 2612 (concerning breach of an installment contract), and 2703 (concerning a seller's general remedies for breach). PA. CONS.STAT. §§ 2106, 2610, 2612, 2703. Counsel further requested that the judge permit him to read the sections into evidence. The trial judge agreed to take judicial notice of the sections but refused to allow them to be read into the record. Specifically, the judge stated: "We can discuss that on [sic] the context of the Charge."

At some point, Bayer submitted its "discussion draft" of the jury charge. The instructions accompanying proposed Question No. 1, regarding whether Bayer failed to comply with the agreement, explained that in the installment contract context, a breach of one installment is not necessarily a breach of the entire contract and necessarily entitles the non-breaching party only to damages pertaining to that installment. The draft also included a question asking whether Bayer's failure to comply was excused due to DX's prior material breach. The instructions accompanying this question explained that in the installment context, a breach of one installment does not precipitate breach of the entire agreement unless it substantially impairs the value of the whole contract. The record does not reflect whether the trial court specifically ruled on these proposed instructions.

On February 23, 2005, the trial court held a jury charge conference. During the conference, Bayer neither made any objection to Question No. 1, regarding whether Bayer breached, nor offered any instructions concerning cancellation, excuse, or justification. The final charge does not identically match either Bayer's or DX's proposed charges.[15]

Later on February 23, after the jury retired for deliberations, it sent out three questions, which the trial court answered tersely. On the same day, the jury sent out what the trial judge called a "clarification request." It stated: "Provided that there is no cancellation clause in the contract, will cancellation in itself constitute a breach of contract?" Bayer's counsel insisted that the proper answer to the question was "no" and then requested that "the court read to the jury the sections of which the Court took judicial notice." In response, DX's counsel asserted that the answer was not as simple as merely saying "no," because a cancellation would constitute a breach unless the cancellation was justified. DX's counsel then questioned how the court could supply "a whole new set of instructions on what justifies cancellation." To which Bayer's counsel responded: "The Court's already given them the correct instruction." And the judge stated: "Right. Which is exactly why I am not going to answer this question." Bayer's counsel then stated: "If you are not going to say directly 'no,' your honor, which I think you should, it ought to be not necessarily 'read the Charge.'" The judge then sent the question back into the jury with the response: "Please answer the question in accordance with the instructions given and the Charge."

Before the jury left for the day, it apparently sent out two additional notes: one

**15.** It is likely, but not clear from the record, that the trial court held an earlier, less formal charge conference during which the final charge was drafted and possibly agreed upon. When the jury sent out the question at issue in this appeal, the judge told counsel that he had submitted "all the instructions you wanted." Then, when Bayer proposed a specific supplemental instruction, the judge stated that the instruction looked like one that had been proposed earlier, but "we chose to go a different way with this."

requesting to see certain exhibits and another requesting a highlighter pen. The next day, February 24, when the issue of the additional requests was raised, Bayer's counsel took the opportunity to readdress the jury's cancellation query from the day before.[16] Specifically, counsel mentioned Rule 286 of the Texas Rules of Civil Procedure and tendered proposed supplemental instructions. Although the proposed instructions were apparently in writing, Bayer does not cite to them in the record. However, Bayer's counsel represented to the trial court that the proposed supplemental instructions were identical to ones "previously submitted," presumably meaning in the "discussion draft" mentioned above. The proposed instructions apparently contained several parts, including one specifically mentioned by counsel that "a party to the contract may cancel the contract if the other party to the contract is in breach and such breach substantially impairs the whole of the contract." The court responded by saying that this proposed instruction "looks to me like ... one of the instructions that was submitted originally in the proposed charge, and we chose to go a different way with this." DX's counsel asserted that "just sending an unsolicited instruction in is like a lightning bolt." Ultimately, the judge denied Bayer's request.

### B. Standards for Preservation

▇▇▇▇ Objections to supplemental jury instructions must be made in conformity with the rules governing submission of the charge. *Scott Fetzer Co. v.*

*Read,* 945 S.W.2d 854, 871 (Tex.App.-Austin 1997), *aff'd,* 990 S.W.2d 732 (Tex.1998); *see also Willis v. Donnelly,* 118 S.W.3d 10, 29 (Tex.App.-Houston [14th Dist.] 2003) (applying general rules of charge submission in supplemental charge context), *aff'd in part, rev'd in part,* 199 S.W.3d 262 (Tex.2006); *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 833–34 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.) (same). Generally, to preserve for appellate review a complaint premised on a defective jury charge question, a party must bring the objectionable matter to the trial court's attention and state the basis for the objection. Tex.R. Civ. P. 274; *ASEP USA, Inc. v. Cole,* 199 S.W.3d 369, 377 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Flo Trend Sys., Inc. v. Allwaste, Inc.,* 948 S.W.2d 4, 10 (Tex.App.-Houston [14th Dist.] 1997, no writ). The test for preservation of a jury charge complaint is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992). However, where an appellant contends that the trial court improperly omitted a question or instruction on an issue in the charge, the appellant must do more than just object to preserve the issue on appeal. The failure to submit a question or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment. Tex.R. Civ. P. 278; *Union*

---

**16.** It is impossible to determine the exact timing of the jury questions and the discussions thereof from this record. The judge responded to the cancellation query before the end of the day on February 23, but it is uncertain at what time of day the notes were sent out or the judge responded. The judge stated on February 24 that the two additional requests (for the exhibits and a highlighter) had been sent out at the end of the previous day. Beyond the fact that it was February 24 (the next day), there is no indication in the record as to when the additional requests (and Bayer's proposed written instructions) were discussed by the judge and counsel. Bayer asserts that the discussion occurred "the very next morning," but neither it nor the record offers a more exact time.

*Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). Thus, an appellant does not preserve the issue of an omitted instruction or question for appellate review unless the appellant: (1) tenders a written request to the trial court for submission of the question, (2) which is "in substantially correct wording." *See* TEX.R. CIV. P. 278; *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 637–38 (Tex.1995); *ASEP USA,* 199 S.W.3d at 376–77.

### C. Failure to Preserve

■ Bayer contends that it made a timely and proper submission to the trial court regarding cancellation when it requested a jury instruction as follows: "[a] party to the contract may cancel the contract if the other party to the contract is in breach and such breach substantially impairs the whole contract." This request was not made, however, until the day after the jury sent its cancellation query. On February 23, the day the jury sent its query, Bayer's counsel argued only that the correct answer was "no," and that barring that answer the court should read four sections of the UCC to the jury. On appeal, Bayer does not assert that either suggestion would have been proper. *See Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639–40 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (holding that to have preserved error, a party's argument on appeal must comport with its argument in the trial court). Indeed, Bayer's own subsequent submission suggests that a simple "no" answer to the jury's query would have been incorrect, indicating that cancellation could constitute a breach if it were unjustified.[17] Further, Bayer does not contend on appeal that reading the UCC sections to the jury would have either been

proper or would have answered the jury's question. These were the only two requests that Bayer made on the day the jury sent out its note. Furthermore, Bayer's counsel inconsistently stated on this first day that "[t]he Court's already given them the correct instruction." Moreover, because on appeal Bayer contends that the trial court erred in omitting an instruction regarding cancellation, it was required to submit the requested instruction in writing. TEX.R. CIV. P. 278; *Hinds,* 904 S.W.2d at 637–38. Consequently, the oral statements made on February 23 failed to preserve error. TEX.R.APP. P. 33.1(a); TEX.R. CIV. P. 272, 274, 278; *see also Willis,* 118 S.W.3d at 29 (holding oral request for supplemental instruction was not sufficient to preserve error after jury sent out note).

After the court responded to the question, the jury apparently sent out two additional and unrelated requests and concluded deliberations for the day. At some point during the following day, Bayer's counsel submitted proposed supplemental instructions in writing to the court. Regardless of the merits of these proposed instructions, they were clearly untimely. *See Read,* 945 S.W.2d at 871 (holding that in order to preserve error for appellate review on a complaint about a supplemental charge, a party must make any objections or requests to such charge before it is given to the jury); *Texaco, Inc.,* 729 S.W.2d at 834 (holding that party failed to preserve error when it did not object to supplemental instruction until the following day). The trial judge himself indicated that the request was untimely when he stated: "You made the request for Additional Instruction 286, right, based on the

---

**17.** By urging the court to respond "no" to the jury's query, Bayer's counsel may have been alluding to the argument that Bayer had proven that the breach was justified as a matter of

law. However, as we held above, Bayer failed to prove that cancellation was justified as a matter of law.

jury questions submitted by the jury in writing on a point of law that was answered by the Court yesterday. And I have declined to reraise the issue." Because Bayer failed to make a proper request regarding supplementation of the charge until the day after the jury's note was received and answered, it has failed to preserve its complaint for appellate review. Bayer's fourth issue is overruled.

## VI. Damages

Bayer's fifth, sixth, and seventh issues concern the calculation and awarding of damages. In its fifth issue, Bayer contends that the trial court erred in admitting the testimony of DX's damages expert because his testimony was based on improper methodology and improper foundation. In its sixth issue, Bayer contends that any award of lost profits was precluded by the contract and applicable law. In its seventh issue, Bayer contends that the evidence was legally and factually insufficient to support the jury's damages award. We begin by considering issue seven, challenging the legal and factual sufficiency of the evidence regarding damages.

### A. Sufficiency

Question No. 4, concerning damages caused by Bayer's failure to comply with the contract, asked the jury as follows:

### QUESTION NO. 4

■ What sum of money, if any, if paid now in cash, would fairly and reasonably compensate DX Terminals, Ltd. for its damages, if any, resulting from Bayer Corporation's failure to comply with the contract between DX Terminals, Ltd. and Bayer Corporation?

"Market price" is the price for which DX Terminals, Ltd. could have obtained caustic soda at the place of tender at the time DX Terminals, Ltd. learned of the breach.

Consider the following elements of damages, if any, and none other:

The difference, if any, between the cost to purchase caustic soda as substitute for caustic soda that Bayer Corporation failed to deliver and the price for caustic soda under the contract between DX Terminals, Ltd. and Bayer Corporation, less any expenses saved because of Bayer Corporation's failure to comply with the contract;

The difference, if any, between the market price for caustic soda at the time Bayer Corporation failed to comply with the contract and the price for caustic soda under the contract between DX Terminals, Ltd. and Bayer Corporation, less any expenses saved because of Bayer Corporation's failure to comply with the contract; and

The difference between what DX Terminals, Ltd. actually earned and what it would have earned if Bayer Corporation had complied with the contract.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find DX could have avoided by the exercise of reasonable care.

Answer in dollars and cents, if any.

Answer: $7,500,00.00

Because Bayer did not object to the definitions and instructions contained in this submission, we must examine the sufficiency of the evidence in light of the charge as given. *See, e.g., Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.,* 178 S.W.3d 198, 206 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Furthermore, unless the record clearly demonstrates otherwise,

we presume that the jury followed the court's instructions on damages. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex.2003).

 Question No. 4 appears to instruct the jury on the UCC buyer remedies. Under the UCC, when a seller fails to make delivery or repudiates the contract, as Bayer did here, the buyer may elect to "cover" by purchasing substitute goods and recover damages, or it may elect to simply recover damages without attempting to cover. PA. CONS.STAT. §§ 2711, 2712. If the buyer elects to cover, it is then entitled to "recover from the seller as damages the difference between the cost of cover and the contract price, together with any incidental or consequential damages ... but less expenses saved in consequence of the breach by the seller." *Id.* § 2712. Absent cover, the buyer's measure of damages "is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages ... but less expenses saved in consequence of the seller's breach." *Id.* § 2713. A buyer does not have to attempt to cover before seeking damages for breach. *Id.* § 2712(c).[18] But once a buyer obtains cover, damages are to be calculated in context of the price paid for the cover (at least to the extent reasonable cover was obtained). *See id.* § 2712(b); *Aztec Corp. v. Tubular Steel, Inc.*, 758 S.W.2d 793, 800 (Tex.App.-Houston [14th Dist.] 1988, no writ). The UCC presumes that cover is proper and sets the market price. *Dura–Wood Treating Co. v. Century Forest Indus., Inc.*, 675 F.2d 745, 753 (5th Cir.1982); *Kiser v. Lemco Indus., Inc.*, 536 S.W.2d 585, 589 (Tex.Civ.App.-Amarillo 1976, no writ); *see also Mueller*

*v. McGill*, 870 S.W.2d 673, 675–76 (Tex. App.-Houston [1st Dist.] 1994, writ denied).

Question No. 4 contains three paragraphs describing the elements of damages for the jury's consideration. The first presents the concept of cover damages, the second presents the calculation for non-cover damages, and the third presents incidental or consequential damages. The question does not, however, in any way limit or structure the jury's consideration of damages as among these elements; for example, the jury could have calculated damages based on market price under the second paragraph even though there may have been evidence that DX obtained cover to some extent.

Bayer argues that there was no evidence in the record to support the jury's finding of damages in the amount of $7.5 million. In its appellee's brief, DX points out that the contract itself provides the proper measure of damages when it establishes a price based on subtracting $27.50 from the lowest of three possible determinants: the published contract price for caustic soda, the published spot market price for caustic soda, and the average price DX paid for non-Bayer caustic soda in any given month (see contract excerpt below). Bayer responds that (1) DX did not argue this method in the trial court but instead presented through its expert a complicated calculation of damages including pre- and post-cancellation cover, market, and lost profits damages; (2) there is no evidence to support the conclusion that $27.50 per ton is an accurate measure of damages for breach of the contract, and (3) there is no evidence supporting the shortfall quantity

---

18. A buyer may only recover consequential damages, however, to the extent that such damages could not be reasonably prevented by cover. PA. CONS.STAT. § 2715(b)(1), cmt. 3;

*Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 781 (Tex.App.-Fort Worth 2005, pet. granted, judgm't vacated w.r.m.).

required to be multiplied by $27.50 per ton in order to reach the $7.5 million found by the jury. We will discuss each argument in turn.

### 1. DX's Trial Position

 The fact that neither DX nor DX's expert used this exact calculation at trial in requesting or determining damages does not by itself render the evidence insufficient to support such a calculation as DX's damages. First, concerning the expert's testimony, contrary to Bayer's contention, unless the subject matter requires expert testimony to be understood, a jury does not have to rely solely on an expert's opinion in calculating damages. *See City of Keller*, 168 S.W.3d at 820 ("Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone."); *Bowen v. Robinson*, No. 01–05–00605–CV, 2006 WL 2192792, at *8, —— S.W.3d ——, —— (Tex.App.-Houston [1st Dist.] Aug. 3, 2006, pet. filed) (holding that lost profit damages had to be shown with reasonable certainty, were a fact-intensive determination, and *could be* proven by expert testimony); *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 48–49, 51 (Tex.App.-San Antonio 2006, no pet.) (holding that jury was not required to accept expert's damages model but could award amount that had a rational basis and fell within the range of evidence presented at trial); *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied) (affirming award of lost profits below amount testified to by expert, even though the specific calculation was inexplicable, because the jury could have reasonably concluded the evidence supported the lesser amount); *Parallax Corp.,*

*N.V. v. City of El Paso*, 910 S.W.2d 86, 91–92 (Tex.App.-El Paso 1995, writ denied) (holding that expert testimony on damages in condemnation case is not binding on jury where there is other evidence of value). Bayer does not suggest that damages in this case could only be understood with the help of expert testimony, and it would not appear that the jury would have needed expert testimony to make the calculation in question: multiplying $27.50 times the number of shortfall tons. Second, a jury is not tied to awarding damages exactly as requested by the injured party. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex.2000) (holding jury was not limited to awarding damages as requested by party if there was evidence supporting a different amount).

 Bayer cites cases requiring that calculations of lost profits damages be based on one complete calculation. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 85 (Tex.1992). However, the calculation based on $27.50 per ton under the contract is a measure of direct damages, not lost profit or consequential damages. *See generally* PA. CONS.STAT. §§ 2713, 2715; *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 878 (11th Cir.2005). Further, the concept of damages "based on one complete calculation" simply means that damages must be based on one method of calculation and cannot be the result of combining figures from several methods. *See Szczepanik*, 883 S.W.2d at 649; *Holt Atherton Indus.*, 835 S.W.2d at 85. These cases do not hold or suggest that calculation of direct damages under the UCC must be supported by expert testimony presenting a definitive calculation.[19] Bayer's first argument regarding the $27.50

---

**19.** Furthermore, it is unclear that the jury awarded any amount for lost profits. Bayer spends considerable time in its brief discount-

ing the evidence of lost profits; the jury may well have agreed and not awarded lost profits.

per shortfall ton measure of damages is without merit.

## 2. Evidence on Measure of Damages

 In its second argument, Bayer asserts that no admitted evidence supports the conclusion that $27.50 per shortfall ton was an accurate measure of damages. To the contrary, DX's president, Rick Karm, suggested in his testimony that under the contract with Bayer, DX could always get a $27.50 discount per ton. Additionally, Bayer's own Aleta Richards, head of the marketing group overseeing caustic soda sales, testified that the contract guaranteed DX $27.50 per ton off the market price and basically gave it $3.7 million per year.[20] But the best evidence that $27.50 per ton is a proper measure of damages is the contract itself. Addendum I to the contract reads as follows:

### ADDENDUM I

### DX Terminals, LTD

*February 1, 1999—December 31, 2003*

Price

Interval: Prices will be established on a monthly basis pursuant to the formula set forth below, no later than the 10th day of the current month.

Price: All numbers are in $ per dry short tons

Lowest of (A, B, or C) − $27.50/dst = DXT's price from Bayer *1 *2

Where A = CMAI published contract price in $ per dry short tons

B = CMAI published spot price in $ per dry short tons

C = DXT's average purchase price of non-Bayer material for the current month in $ per dry short tons

*1 If this value is less than zero, Seller will not be required to pay Buyer, for taking delivery, and Buyer will not be required to take delivery if the value is less than negative $10.00 unless Seller agrees to compensate Buyer.

*2 The difference between the lower of A or B and DXT's price from Bayer shall in no event exceed $35/dst. Buyer and Seller agree to meet in good faith and review status of A, B & C.

If it is determined CMAI due to timing, unstable markets or other reasonable factors are out of line with market.

Terms: F.O.B. Shipping Point

Net 30 Days

Freight Collect

Thus, DX was guaranteed a price per ton of $27.50 less than three possible indicators of market price: the published contract price, the published spot market price, and the average price DX paid for non-Bayer caustic soda for any given month. UCC section 2713, and the jury charge, allow for damages to be calculated based on the difference between market price and the contract price (together with incidental or consequential damages but less expenses saved). PA. CONS.STAT. § 2713. UCC section 2724 permits commodity market prices to be determined by reference to "reports in official publications or trade journals or newspapers or periodicals of general circulation published as the reports of such market." *Id.* § 2724. Bayer does not suggest that the CMAI published prices referenced in the contract are not appropriate market measures.

Bayer further asserts that there is no evidence in the record of what the actual market price was during the periods rele-

---

20. She explained that through the discount, Bayer was basically paying DX to handle the logistics of removing the caustic soda from Bayer's facility.

vant to calculating damages. But this case and this contract present rare circumstances in which proof of the actual market price is not necessary because damages can be calculated without knowing the actual market price.[21] Whatever the price, damages can be calculated by multiplying $27.50 times the number of shortfall tons. Knowing the actual market price adds nothing to the analysis.[22] Accordingly, Bayer's second argument is without merit.[23]

### 3. Shortfall Tons

 Lastly, Bayer maintains that there is no evidence in the record to establish the shortfall quantity required to be multiplied by $27.50 per ton in order to reach the $7.5 million in damages found by the jury.[24] To the contrary, the calculation appears quite clear. From the time that Bayer stopped supplying caustic soda to DX to the time that the contract was scheduled to end (around November 2001 to December 2003) was about 26 months.[25]

26 (months in breach) × 11,250 (monthly minimum tonnage) × $27.50 (discount per ton) = $8,043,750

While there is a difference between this figure and the jury finding, the UCC (and the charge) permits a buyer to recover whether those damages were cover damages under section 2712 or non-cover damages under section 2713.

Additionally, Bayer suggests that DX had the opportunity to obtain reasonable substitute caustic soda at below market price. Even if this were true, the contract provides that DX was entitled to $27.50 off the lowest of three price determinants, including DX's average purchase price of non-Bayer material. Thus, even if DX could have obtained caustic soda below the published market price, it was still entitled to a $27.50 discount from Bayer. Indeed, DX's president, Karm, testified to this exact point.

---

21. Furthermore, the record does contain the CMAI Chlor–Alkali Market Reports for February 1, 1999, through May 28, 2004 (issues 56 through 120 with supplements).

22. It should be noted that the contract does allow for the possibility that one of the methods for calculating DX's price could result in a value of less than zero. In that case, Bayer would not have been required to pay DX to take delivery and DX would not have been required to take delivery. However, there is no suggestion in the record that the price of caustic soda ever got that low during the life of the contract.

23. Although the charge as submitted did not require the jury to calculate damages based on cover to the extent cover was obtained, the $27.50 figure in the contract could also have been used in determining cover damages. Cover damages are calculated as the difference between the cost of cover and the contract price (together with any incidental or consequential damages and minus expenses saved). Pa. Cons.Stat. § 2712. As stated above, the UCC presumes that cover is proper and that it sets the market price. *Dura–Wood Treating*, 675 F.2d at 753; *Kiser*, 536 S.W.2d at 589. The contract essentially guarantees DX a discount of $27.50 off market price, and even includes a method of calculating market price based on the average price DX paid for non-Bayer caustic soda for any given month. Thus, it would have been reasonable for the jury to calculate all of DX's damages for shortfalls at $27.50 per ton, regardless of

24. The jury did not necessarily find that Bayer committed any breach prior to cancelling the contract; thus, the entire $7.5 million in damages it awarded to DX may have been for post-cancellation breach. In fact, Bayer strenuously argues that it committed no breach prior to cancellation.

25. Exact times and amounts are difficult to deduce on this record. Bayer cancelled the contract effective November 1, 2001. A chart prepared and introduced by Bayer purports to show a summary of amounts delivered through October 2001 and nothing thereafter. DX states in its brief that there were only 25 months of absolute nonperformance. An exact figure for the shortfall tons is neither possible nor necessary, and a variation of one month of deliveries or so does not alter our analysis.

damages less any amounts saved as a result of the seller's breach. Bayer does not suggest that DX did not save any expenses because of the contract cancellation. It is also possible that the jury took into consideration the fact that DX had not always taken required minimums during the course of the contract. Accordingly, the jury may have lessened the number of shortfall tons in its calculations and, thus, reduced the ultimate amount of damages awarded for Bayer's failure to perform. Furthermore, exact damages figures for breaches of high dollar commercial contracts are rarely possible and are not required. *See, e.g., Vela,* 203 S.W.3d at 51 (affirming damages award within range of evidence where jury could have discounted expert's sum based on other evidence); *Howell Crude Oil,* 928 S.W.2d at 108 (affirming damages award within range of evidence even though the specific calculation was inexplicable); *see also Bowen,* 2006 WL 2192792, at *8, —— S.W.3d at —— (stating that lost profits do not have to be proven by an exact calculation). Accordingly, Bayer's third argument is without merit. Because we find that there was sufficient evidence to support the jury's damages award to DX, we overrule Bayer's seventh issue.

### B. Harmless

 Because the jury's damages finding is supported by the $27.50 calculation, any error alleged in Bayer's fifth and sixth issues would be harmless. In its fifth issue, Bayer contends that the trial court erred in admitting the testimony of DX's damages expert because his testimony was based on improper methodology and improper foundation. The admission and exclusion of evidence are within the sound discretion of the trial court. *City of*

*Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). The complaining party must show that the trial court erred and that such error probably resulted in an improper judgment, which usually requires a showing that the judgment turned on the challenged evidence. *Id.* at 753–54; *Prestige Ford Co. Ltd. P'ship v. Gilmore,* 56 S.W.3d 73, 78 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also* Tex. R.App. P. 44.1(a)(1) (requiring that before a judgment can be reversed on appeal it must be determined that the error probably caused rendition of an improper judgment or prevented the appellant from properly presenting the case on appeal). Because the jury's damages award is supported by a calculation and related evidence not specifically relied upon by DX's expert, it cannot be shown that the ensuing judgment turned on the expert's testimony. *See Fairmont Supply Co. v. Hooks Indus., Inc.,* 177 S.W.3d 529, 531–32 (Tex. App.-Houston [1st Dist.] 2005, pet. denied) (holding that possibly erroneous admission of expert testimony on lost profit damages was harmless where other unobjected-to testimony supported jury's lost profits award). Accordingly, we overrule Bayer's fifth issue.

 In its sixth issue, Bayer contends that the trial court erred in awarding lost profits damages because such damages were precluded by the contract and applicable law. However, it does not appear that the jury or the trial court necessarily awarded any amount for lost profits. As noted above, the charge on damages did not require the jury to calculate lost profits damages.[26] The jury may have simply calculated damages based on the non-cover, market price calculation using the

---

**26.** Additionally, Bayer has strenuously argued that there was insufficient evidence of lost profits damages to support such an award.

$27.50 contract discount without calculating lost profits damages. Indeed, as explained above, the resulting damages figure is sufficiently similar to the amount awarded by the jury eliminating any lost profits. Therefore, this record does not support Bayer's assertions that (1) the trial court erred in awarding lost profits damages, or (2) any such error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(1)(a). Accordingly, we overrule Bayer's sixth issue.

## VII. Cross–Appeal

In its cross-appeal, DX contends that the trial court erred in calculating prejudgment interest and in ordering each side to pay its own costs. We consider each issue in turn.

### A. Prejudgment Interest

In the judgment, the trial court awarded prejudgment interest to DX beginning December 31, 2003 (the last day that the contract was to have been in force) and running to the date that the jury returned its verdict. In its first issue, DX makes two specific arguments regarding this award: (1) the trial court should have begun its calculation of prejudgment interest on the full amount of damages beginning on September 11, 2001, the date on which Bayer cancelled the contract; and (2) in the alternative, the trial court should have calculated prejudgment interest on a prorated basis from the date of cancellation.

The parties agree that Pennsylvania substantive law controls this issue. The very purpose of awarding a party prejudgment interest is to compensate that party for the loss of use of money. *See Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh,* 776 F.2d 1174, 1178–79 (3d Cir.1985) (discussing Pennsylvania law); *Schleeter v. Intrieri,* 326 Pa.Super. 233, 473 A.2d 1067, 1068–69 (1984) ("Interest is the compensation allowed by law or fixed by contract for the deprivation of the use of money. When there is no such deprivation, no interest can be awarded."); Restatement (Second) of Contracts § 354, cmt. a (1981) ("Had the performance been rendered when it was due, the injured party would have been able to make use of it. Interest is a standardized form of compensation to the injured party for the loss of that use . . . .").[27] It is not intended as a punitive measure. *See Benefit Trust Life,* 776 F.2d at 1178. Therefore, prejudgment interest in contract cases must be calculated only from the time performance becomes due. *See, e.g., Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs.,* 454 Pa.Super. 188, 685 A.2d 141, 148–49 (1996); Restatement (Second) of Contracts § 354(1) & cmt. a. To begin calculating interest from a prior point would overcompensate the injured party, or stated another way, it would give the party a remedy (interest) before there was any harm (loss of use of money or performance). Here, although DX is correct that the jury apparently found that Bayer breached the contract when it cancelled the contract in September 11, 2001, DX did not begin to incur actual damages until Bayer stopped making required deliveries of caustic soda, apparently sometime in November or December 2001. Even then, DX was harmed only to the extent that Bayer failed to deliver the amount due for that month. The damages were then incurred month-to-month, and the loss of use of money (or performance), for which prejudgment interest is designed to compensate, only oc-

---

**27.** Pennsylvania has adopted the Restatement regarding prejudgment interest in contract cases. *See Penneys v. Pa. R.R. Co.,* 408 Pa. 276, 183 A.2d 544, 546 (1962); *see also Benefit Trust Life,* 776 F.2d at 1178–79 (discussing *Penneys* and other Pennsylvania cases).

curred from month-to-month and not all at once in September 2001. Thus, the trial court did not err in refusing to award prejudgment interest on the full amount of damages beginning in September 2001.

 As an alternative argument, DX asserts that the trial court should have calculated prejudgment interest on a pro-rated basis. Bayer initially contends that DX waived this argument by failing to sufficiently bring it to the trial court's attention. In order to preserve an issue for appellate review, the record must demonstrate that the issue was brought to the trial court's attention by a timely and sufficiently specific request, objection, or motion. TEX.R.APP. P. 33.1(a)(1). The record must also demonstrate that the trial court ruled on the request, objection, or motion, either expressly or implicitly, or if the court refused to make a ruling, that the requesting party objected to such refusal. *Id.* 33.1(a)(2).

In its Motion for Judgment on the Verdict, DX requested only prejudgment interest calculated from the date of cancellation in September 2001. DX did not mention the possibility of prorating prejudgment interest. In DX's subsequent response to Bayer's objections to the motion, DX again mentions only the calculation beginning in September. At the hearing on the entry of judgment, DX's counsel stated to the trial court as follows:

> The judgement [sic] we submitted will start with September 2, 2001, and applied [sic] the 6 percent interest to the 7 and a half million damages from that point.... We have, if the Court has any interest in seeing it, an alternative calculation of prejudgment interest that divides the post-termination amount equally and runs it month by month....

> Take the amount of damages over however months [sic] it has and figure an equal amount for each month and just begin accruing from each month as they pass in effect. If the Court wants to see it. That really is the question.

Counsel then went on to argue that the correct calculation was from September 2001 and moved for entry of judgment in the form submitted, with interest running from September 2001 on the full amount.

In its final judgment, the trial court appears to have lined out the amount of interest as supplied by DX in the draft—running on the full amount of damages from September 2001—and written in an amount of interest calculated from the final day that the contract was to have been in place, as urged by Bayer. DX does not point to any other place in the record where it presented the prorated calculation to the trial court. It was presented neither in DX's response to Bayer's Motion for New Trial nor at the hearing on that motion, and DX did not file any post-judgment motions. We find that DX's brief mention of the alternative calculation was not sufficient to preserve this issue for appeal, particularly given DX's failure to actually make a request, objection, or motion based on the alternative calculation, and the trial court's failure to make an express ruling on such calculation.[28] *See* TEX.R.APP. P. 33.1(a). Accordingly, we overrule DX's first issue.

### B. Costs

 In its second issue, DX contends that the trial court erred in ordering each side to pay its own costs. Generally, the successful party to a suit shall recover all costs from the opposing party. TEX.R. CIV. P. 131; 303. A "successful party" under the rules is one that obtains a judg-

---

28. Regarding the propriety of a prorated calculation of prejudgment interest in relation to an installment contract, see generally, RESTATEMENT (SECOND) OF CONTRACTS § 354, illus. 7.

ment vindicating a civil right. *E.g., Perez v. Baker Packers,* 694 S.W.2d 138, 143 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.). Notwithstanding the general rule, a trial court may, for good cause shown, otherwise award costs. Tex.R. Civ. P. 141. "When a counterclaim is pleaded, the party in whose favor final judgment is rendered shall also recover the costs. . . ." Tex.R. Civ. P. 303. We review a trial court's allocation of costs under an abuse of discretion standard. *Univ. of Houston–Clear Lake v. Marsh,* 981 S.W.2d 912, 914 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

■ DX contends that it was the successful party, and thus entitled to costs, because the final judgment awarded it $7,460,000 plus pre- and post-judgment interest. Bayer contends, however, that it, too, was a successful party in the litigation because the jury awarded it $40,000 for DX's breach of contract (which the trial court offset against DX's recovery in the judgment), and because it prevailed on DX's claim for tortious interference.

Texas appellate courts have not been entirely consistent in reviewing trial courts' splitting of costs between opposing parties, particularly when claims and counterclaims are involved. Some courts have held that the party receiving the larger recovery is entitled to costs. *Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 895 (Tex.App.-San Antonio 1996, writ denied); *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 580 S.W.2d 850, 866 (Tex.Civ.App.-Corpus Christi), *rev'd on other grounds,* 592 S.W.2d 340 (Tex.1979); *Willingham v. Hagerty,* 553 S.W.2d 137, 139–40 (Tex.Civ. App.-Amarillo 1977, no writ). Other courts have held that when both sides successfully prosecute their claims, a trial court can in its discretion split costs between the parties. *Niemeyer v. Tana Oil & Gas Corp.,* 39 S.W.3d 380, 389–90 (Tex. App.-Austin 2001, pet. denied); *Building Concepts, Inc. v. Duncan,* 667 S.W.2d 897, 905–06 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.); *see also Mobil Producing Tex. & New Mexico, Inc. v. Cantor,* 93 S.W.3d 916, 920 (Tex.App.-Corpus Christi 2002, no pet.) ("A trial court does not abuse its discretion in taxing costs against both sides where neither party was wholly successful in that one expected to receive more while the other expected to pay less."); *Okon v. Levy,* 612 S.W.2d 938, 943–44 (Tex.Civ.App.-Dallas 1981, writ ref'd n.r.e.) (same).[29]

Other than citing to Rules 131 and 303 and the *Chilton Insurance* case, DX offers no reasoning as to why we should abandon or distinguish our prior holding in *Building Concepts.*[30] Accordingly, we follow our established precedent and overrule DX's second issue.

We affirm the trial court's judgment.

---

**29.** In *Okon,* the court examined the record to determine if the trial court stated its reasons for splitting costs in the record, whereas in *Mobil Producing,* the court did not consider whether the trial court stated its reasoning. *Mobil Producing,* 93 S.W.3d at 920; *Okon,* 612 S.W.2d at 944. Rule 141 permits a trial court to otherwise adjudge costs "for good cause, to be stated on the record." However, neither *Okon* nor *Mobil Producing* involved counterclaims, which are specifically treated in Rule 303.

**30.** In *Building Concepts,* we noted that "It is clear from the record that the judge assessed the costs as he did because *both* parties successfully prosecuted their claims." 667 S.W.2d at 905–06 (emphasis in original). The same is true here.